# United States Court of Appeals
## For the First Circuit

No. 09-2596

PLUMBERS' UNION LOCAL NO. 12 PENSION FUND, Individually and on
behalf of all others similarly situated; PLUMBERS' & PIPEFITTERS'
WELFARE EDUCATIONAL FUND; NECA-IBEW HEALTH & WELFARE FUND,

Plaintiffs, Appellants,

v.

NOMURA ASSET ACCEPTANCE CORPORATION; JOHN P. GRAHAM; NATHAN
GORIN; JOHN McCARTHY; DAVID FINDLAY; ALTERNATIVE LOAN TRUST 2006-
AF1; ALTERNATIVE LOAN TRUST 2006-AF2; ALTERNATIVE LOAN TRUST
2006-AP1; ALTERNATIVE LOAN TRUST AR2; ALTERNATIVE LOAN TRUST AR3;
ALTERNATIVE LOAN TRUST 2006-AR4; ALTERNATIVE LOAN TRUST 2006-WF1;
NOMURA SECURITIES INTERNATIONAL, INC.; GREENWICH CAPITAL MARKETS,
INC.; UBS SECURITIES, LLC; CITIGROUP GLOBAL MARKETS, INC.;
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; GOLDMAN, SACHS &
CO.; ALTERNATIVE LOAN TRUST 2006-AR1,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before
Boudin and Howard, Circuit Judges,
and Barbadoro,* District Judge.

Eric Alan Isaacson with whom Arthur C. Leahy, Joseph D. Daley,
Thomas E. Egler, Susan G. Taylor, Nathan R. Lindell, Amanda M.
Frame, Coughlin Stoia Geller Rudman & Robbins LLP, Thomas G.
Shapiro, Adam M. Stewart, Robert E. Ditzion and Shapiro Haber &
Urmy LLP were on brief for appellants.

---

*Of the District of New Hampshire, sitting by designation.

     Stephen D. Poss with whom Sarah Heaton Concannon and Goodwin Procter LLP were on brief for the issuer defendants, appellees Nomura Asset Acceptance Corporation, John P. Graham, Nathan Gorin, John McCarthy, David Findlay, Alternative Loan Trust 2006-AF1, Alternative Loan Trust 2006-AF2, Alternative Loan Trust 2006-AP1, Alternative Loan Trust 2006-AR1, Alternative Loan Trust 2006-AR2, Alternative Loan Trust 2006-AR3, Alternative Loan Trust 2006-AR4, Alternative Loan Trust 2006-WF1.

     William H. Pane with whom Mark C. Fleming, Timothy J. Perla and Wilmer Cutler Pickering Hale and Dorr LLP were on brief for the underwriter defendants, appellees Nomura Securities International, Inc., Greenwich Capital Markets, Inc., UBS Securities LLC, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., and Goldman, Sachs & Co.

---

January 20, 2011

---

**BOUDIN, <u>Circuit Judge</u>.** Three union pension and welfare funds[1] appeal from a district court order dismissing at the complaint stage their putative class action against eight trusts, the "depositor" that organized them, the trusts' underwriters and five officers of the depositor. The lawsuit sought redress for losses suffered when plaintiffs acquired trust certificates representing mortgage-backed securities. The background facts are largely undisputed.

The lead defendant, Nomura Asset Acceptance Corporation ("Nomura Asset"), played the organizing role in the creation of the securities at issue in this case. As depositor, it acquired mortgages from various banks and transferred them to the eight trusts, all of which are separate legal entities. Each trust pooled the mortgages acquired by it and, with Nomura Asset, issued trust certificates representing interests in that trust. Then Nomura Asset and the trusts worked with underwriters to sell the certificates to investors.

The certificates constitute securities under the federal securities laws, and to permit their initial sale, a registration statement was required, disclosing information about the securities being offered. One registration statement, filed on July 22, 2005,

---

[1]Plumbers' Union Local No. 12 Pension Fund ("Plumbers' Fund"), Plumbers' & Pipefitters' Welfare Educational Fund ("Plumbers' & Pipefitters' Fund") and the NECA-IBEW Health & Welfare Fund ("NECA-IBEW Fund").

-3-

covered three trusts (2006-AP1, 2006-AR1, 2006-AR2); the other, filed on April 16, 2006, covered the remaining five (2006-AF1, 2006-AF2, 2006-AR3, 2006-AR4, 2006-WF1). These were "shelf registrations," see 17 C.F.R. § 230.415(a) (2010), signaling an intent to offer securities in the future and containing certain information about Nomura Asset, the trusts and the securities.

The registration statements were not themselves offerings and did not become effective until Nomura Asset and the trusts updated them by filing prospectus supplements that described the details of the offering for each trust. The registration statements and prospectus supplements (collectively, "offering documents") explain in detail the characteristics of the mortgages that Nomura Asset acquired and transferred to each trust. The federal securities laws, yet to be discussed, impose liability for false or misleading statements causing harm to purchasers.

In this case, plaintiffs bought trust certificates representing interests in two of the eight trusts; one trust (AP1 trust) was covered by the earlier registration statement and a September 27, 2005, prospectus supplement; the other (AF1 trust), by the later of the two registration statements and a May 25, 2006, prospectus supplement. One of the three plaintiffs bought certificates in the AF1 trust, a second in the AP1 trust and the third in both trusts. Thereafter, on November 13, 2007, Moody's downgraded the rating of all of the certificates for all eight

-4-

trusts and the certificates are now worth much less than what plaintiffs originally paid for them. This lawsuit followed shortly thereafter.

On January 31, 2008, one of the three union funds filed suit in state court, asserting violations of sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77l(a)(2), 77o (2006). Section 11 imposes liability for false or misleading statements contained in a registration statement, id. § 77k(a); section 12(a)(2) imposes similar liability on sellers who make such statements in a prospectus or oral communication, id. § 77l(a)(2). Section 15 imposes liability on one who "controls any person liable" under sections 11 or 12. Id. § 77o.

The case was removed to federal district court, the other funds entered as plaintiffs and ultimately a joint amended complaint was filed listing as defendants Nomura Asset, the eight trusts, the trusts' underwriters and five officers and directors of Nomura Asset.[2] The gravamen of the complaint is that the offering

<hr />

[2]Nomura Securities International, Inc. ("Nomura Securities") was the sole underwriter for the AF1, AP1, AR1 and AR2 trusts; the AF2 trust was underwritten by Nomura Securities, Greenwich Capital Markets, Inc. ("GCM") and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"); the AR3 trust was underwritten by Nomura Securities and Goldman, Sachs & Co. ("Goldman"); the AR4 trust was underwritten by UBS Securities LLC ("UBS") and GCM; and the WF1 trust was underwritten by Nomura Securities and Citigroup Global Markets, Inc. ("CGMI"). The officers and directors are John P. Graham, Chief Executive Officer and President of Nomura Asset; Nathan Gorin, Chief Financial Officer of Nomura Asset; and John McCarthy and David Findlay, directors of Nomura Asset. (Another defendant named in the complaint, Shunichi Ito, has apparently

documents contained false or misleading statements, and as a result plaintiffs purchased securities whose true value when purchased was less than what was paid for them. The suit was cast as a class action comprised of purchasers of the certificates of the eight trusts covered by the two registration statements.

Defendants filed motions to dismiss for lack of standing, Fed. R. Civ. P. 12(b)(1), and for failure to state a claim, Fed. R. Civ. P. 12(b)(6). On September 30, 2009, the district court granted defendants' motions to dismiss and entered judgment. Claims related to the trusts whose certificates had been purchased by none of the named plaintiffs were dismissed for lack of Article III standing; claims relating to the other two trusts were dismissed on statutory grounds; and no class was ever certified. The present appeal followed.

Jurisdiction. At the outset, plaintiffs say that the original action brought in state court may have been improperly removed and that the district court may thus have lacked subject matter jurisdiction; although plaintiffs did not contest jurisdiction until they lost the case in the district court, lack of subject matter jurisdiction can be noticed at any time and cannot be waived. United States v. Cotton, 535 U.S. 625, 630 (2002); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-94 (1998). But we conclude that any flaw in the removal was not

never been served with process.)

-6-

one of subject matter jurisdiction and therefore has been waived or forfeited for lack of a timely objection. 28 U.S.C. § 1447(c) (2006) (requiring objection within 30 days of removal).

Removal is ordinarily permitted in civil actions where the same case could originally have been brought in federal court "[e]xcept as otherwise expressly provided by Act of Congress." 28 U.S.C. § 1441(a). One exception--section 22 of the Securities Act, 15 U.S.C. § 77v(a)--is that "no case arising under [the Securities Act] and brought in any State court of competent jurisdiction shall be removed to any court of the United States." However, assuming that this limitation applied,[3] we conclude that section 22's limitation would not be one of subject matter jurisdiction but merely an advantage that a plaintiff could forfeit by failure to make timely objection.

There are some casual references in reported circuit-court decisions to section 22 as a limitation on subject matter jurisdiction, e.g., Emrich v. Touche Ross & Co., 846 F.2d 1190, 1197-98 (9th Cir. 1988) (but the objection was made within 30 days, so that conclusion was dictum); Westinghouse Credit Corp. v. Thompson, 987 F.2d 682, 683 (10th Cir. 1993) (but the remand order

_____

[3]Whether it applied depends on how one resolves a potential conflict between section 22 and language in a later statute, namely, the Class Action Fairness Act's ("CAFA") removal provision. Compare Luther v. Countrywide Home Loans Servicing LP, 533 F.3d 1031, 1034 (9th Cir. 2008), with Katz v. Gerardi, 552 F.3d 558, 562 (7th Cir. 2009)--a dispute we need not address.

-7-

was unreviewable whatever the defect); yet a larger number of circuits have held that similarly phrased anti-removal provisions do not implicate subject matter jurisdiction.[4]

Civil suits asserting claims under the Securities Act are within the "arising under" clause of Article III and can easily be brought as original actions in federal court. 15 U.S.C. § 77v(a). Although expressed as a bar on removal of such cases from state court, section 22(a)'s aim is not to preclude hearing such cases in federal court but instead to "favor[] plaintiffs' choice of forum." Pinto v. Maremont Corp., 326 F. Supp. 165, 167 n.2 (S.D.N.Y. 1971); see Cook, Recrafting the Jurisdictional Framework for Private Rights of Action Under the Federal Securities Laws, 55 Am. U. L. Rev. 621, 632-34 (2006).

Given that federal courts are otherwise competent to address federal securities claims and do so all the time, it makes far more sense to view section 22 as creating a waivable right to insist on non-removal. That course achieves the statute's aim to protect the plaintiff's preference for a state forum, but it prevents the mischief of allowing a party to sit on an objection, raising it only if and when the objector is dissatisfied with the

---

[4]See, e.g., In re Norfolk S. Ry. Co., 592 F.3d 907, 912 (8th Cir. 2010); Vasquez v. N. Cnty. Transit Dist., 292 F.3d 1049, 1062 (9th Cir. 2002); Feichko v. Denver & Rio Grande W. R.R. Co., 213 F.3d 586, 591 (10th Cir. 2000), cert. denied 531 U.S. 1074 (2001); Belcufine v. Aloe, 112 F.3d 633, 638 (3d Cir. 1997); Williams v. AC Spark Plugs, 985 F.2d 783, 787 (5th Cir. 1993).

result.  Cf. 14C C. Wright et al., Federal Practice & Procedure § 3739, at 817-18 (4th ed. 2009) (limiting removal objections to thirty-day period prevents use of a defect as insurance against unfavorable developments).

Standing.  The more difficult threshold question presented by the appeal is whether plaintiffs can pursue claims, to the extent claims may be stated, based on offerings in which they did not participate and against trusts whose certificates they did not purchase.  This issue, styled by defendants primarily as one of Article III standing and secondarily as a standing issue under the Securities Act, was resolved in defendants' favor by the district court.  The issue looks straightforward and one would expect it to be well settled; neither assumption is entirely true.

It is clear that the named plaintiffs have no claim on their own behalf based on trust certificates that they did not buy;[5] and they bought no certificates issued by six of the defendant trusts.  To the extent claims exist based on such purchases, they belong to the actual purchasers.  Since a requisite of an ordinary case or controversy is an injury to the plaintiff

---

[5]For section 11, see Barnes v. Osofsky, 373 F.2d 269, 273 (2d Cir. 1967) (Friendly, J.) (an action under section 11 may be maintained only by "those who purchase securities that are the direct subject of the prospectus and registration statement") (internal quotation marks omitted); for section 12(a)(2), see Pinter v. Dahl, 486 U.S. 622, 644 (1988) (claims under section 12(a)(2) are available only against person who offers or sells the security to the plaintiff).

traceable to the defendant, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992), it might follow that there is also no case or controversy between the named plaintiffs and the trusts from which they made no purchases. Alas, the matter is not so simple.

In a properly certified class action, the named plaintiffs regularly litigate not only their own claims but also claims of other class members based on transactions in which the named plaintiffs played no part. Yet, here certain defendants, including six of the eight trusts named as defendants, are not liable to the named plaintiffs on any claims. In these circumstances older cases, including a decision of this court, have refused to allow the case to proceed--whether as a class action or not--against defendants not implicated in any of the wrongs done to the named plaintiffs.

Thus, in Barry v. St. Paul Fire & Marine Insurance Co., 555 F.2d 3 (1st Cir. 1977), aff'd, 438 U.S. 531 (1978), Rhode Island physicians and patients sought to bring a class action fraud claim on behalf of all physicians and patients in the state against four insurance companies for the sale of certain insurance policies. Id. at 5, 13. Each of the insurance companies had almost certainly sold such policies to some members of the class, but none of the named plaintiffs ever bought that type of policy from two of the companies. The district court declined to allow claims against the latter two companies for the sale of those

-10-

policies and we held there was "no error in the district court's decision to adhere strictly to the traditional [standing] rules." Id. at 13; see also Haas v. Pittsburgh Nat'l Bank, 526 F.2d 1083, 1095-96 & n.18 (3d Cir. 1975).

How far Barry extends today may be debatable. Although its discussion of the issue was terse and not the main focus of the decision, its approach had support not only from sister circuit cases but from statements from the Supreme Court. See Barry, 555 F.2d at 13. And several times since Barry the Supreme Court used Article III concepts in refusing to permit class claims to extend to those suffering injuries materially different than those suffered by the named plaintiffs. Lewis v. Casey, 518 U.S. 343, 346-49, 358 & n.6 (1996); Blum v. Yaretsky, 457 U.S. 991, 999-1002 (1982).[6] For example, Blum stated:

> It is axiomatic that the judicial power conferred by Art. III may not be exercised unless the plaintiff shows "that he personally has suffered some actual or threatened injury as a result of some putatively illegal conduct of the defendant." . . . It is not enough that the conduct of which the plaintiff complains will injure someone.

---

[6]See also 1 J. McLaughlin, Class Actions § 4:28, at 659-60 (6th ed. 2010) ("In a multi-defendant case, a putative class representative must allege that he or she has been injured by the conduct of each defendant to establish standing."); 5 J. Moore et al., Moore's Federal Practice § 26.63[1][b], at 23-304 (3d ed. 2010) ("If a complaint includes multiple claims, at least one named class representative must have Article III standing to raise each claim.").

-11-

457 U.S. at 999 (quoting <u>Gladstone, Realtors</u> v. <u>Vill. of Bellwood</u>, 441 U.S. 91, 99 (1979)).

But the Supreme Court has not been consistent. In <u>Ortiz</u> v. <u>Fibreboard Corp.</u>, 527 U.S. 815 (1999), and <u>Amchem Products, Inc.</u> v. <u>Windsor</u>, 521 U.S. 591 (1997), the Supreme Court ruled that no class should be certified, but in doing so, it bypassed objections that some settling parties lacked standing, saying that the class certification issues were "'logically antecedent' to Article III concerns," <u>Ortiz</u>, 527 U.S. at 831 (quoting <u>Amchem</u>, 521 U.S. at 612). And in <u>Gratz</u> v. <u>Bollinger</u>, 539 U.S. 244 (2003), the Court allowed the named class plaintiff to challenge admissions practices as to college freshman even though his status would have been that of a transfer student subject to different rules. <u>Id.</u> 263-65.

Further, several circuits have cut themselves loose from a strict requirement that, in a plaintiff class action, no defendant may be sued unless a named plaintiff has a counterpart claim against that defendant. Arguing that the class action should be a flexible instrument, these courts conclude that the class action should embrace defendants against whom no named plaintiff has a claim so long as the claims are essentially of the same character as the claim against a properly named defendant, and that the sorting out of this issue should be left to Rule 23 criteria

-12-

rather than by use of standing concepts focusing on named plaintiffs.[7]

There is no reason to inventory stray Supreme Court quotations that can be found on both sides; nor is there a single recent holding by the Court that with perfect clarity resolves the issue directly before us. Indeed, Rule 23 criteria can still be used as a required tool for shaping the scope of a class action without abandoning the notion that Article III creates some outer limit based on the incentives of the named plaintiffs to adequately litigate issues of importance to them. See Baker v. Carr, 369 U.S. 186, 204 (1962) (plaintiffs need "such a personal stake in the outcome of the controversy as to assure . . . concrete adverseness").

For the present, Barry--however terse its treatment--is on our books; and we are inclined (and perhaps required) to follow its lead--with a qualification that does not affect the outcome in this case. The qualification, on which we reserve judgment, is one where the claims of the named plaintiffs necessarily give them--not

---

[7]Payton v. Cnty. of Kane, 308 F.3d 673, 680-81 (7th Cir. 2002), cert. denied, 540 U.S. 812 (2003) (named plaintiffs were only injured by two counties but may be entitled maintain class action against seventeen other counties that implemented the same state statute in a materially identical fashion); Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 421-24 (6th Cir. 1998) (although named plaintiff was only a participant in one ERISA plan, he could represent a class against all of defendant's ERISA plans where the gravamen of the challenge was a general practice that affected all plans).

just their lawyers--essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members.  The matter is one of identity of issues not in the abstract but at a ground floor level.  In such a case, which might include the kind of claims that were present in Payton, 308 F.3d at 680, and Fallick, 162 F.3d at 423, the substance of the Article III concern may vanish even if in form it might seem to persist.

Turning back to our own situation--claims based on mortgage-backed securities--most district courts have continued to hold that named plaintiffs must themselves possess claims against each defendant.  E.g., In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 604-08 (S.D.N.Y. 2006); In re Eaton Vance Corp. Sec. Litig., 220 F.R.D. 162, 166-69 (D. Mass. 2004).  Indeed, one court recently found that

> [e]very court to address the issue in a [mortgage-backed security] class action has concluded that a plaintiff lacks standing under . . . Article III . . . to represent the interests of investors in [mortgage-backed securities] offerings in which the [named] plaintiffs did not themselves buy.

Me. State Ret. Sys. v. Countrywide Fin. Corp., 722 F. Supp. 2d 1157, 1163 (C.D. Cal. 2010).  Interestingly, a handful of district court cases have allowed securities claims to proceed in situations that may fit the possible exception we have outlined above.  E.g.,

-14-

In re Am. Int'l Grp., Inc. 2008 Sec. Litig., No. 08 Civ. 4772(LTS), 2010 WL 3768146, at *22 (S.D.N.Y. Sept. 27, 2010).

In our case, as in others involving mortgage-backed securities, the necessary identity of issues and alignment of incentives is not present so far as the claims involve sales of certificates in the six trusts. Each trust is backed by loans from a different mix of banks; no named plaintiff has a significant interest in establishing wrongdoing by the particular group of banks that financed a trust from which the named plaintiffs made no purchases. Thus, the claims related to the six trusts from which the named plaintiffs never purchased securities were properly dismissed, as were the six trusts and defendants connected to only those six trusts.

Although Nomura Asset is a common defendant with respect to all eight of the trusts, claims against it as well fail so far as they are based on the six trusts whose certificates were purchased by no named plaintiff. Although Nomura Asset is a properly named defendant, the named plaintiffs have no stake in establishing liability as to misconduct involving the sales of those certificates. In the Supreme Court's words: "Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been

subject." Blum, 457 U.S. at 999; see also Lewis, 518 U.S. at 358 n.6.

Adequacy of claims. The district court held that on the face of the complaint, no claims were sufficiently stated. We review that ruling de novo, accepting as true all well-pled facts in the complaint and drawing all reasonable inferences in favor of plaintiffs. SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010) (en banc). But, while this much is clear, the usual difficulty of parsing and evaluating misrepresentation claims at the complaint stage in securities cases is further complicated by recent case law tightening the sieve through which a well-pled complaint must pass.

To state a claim, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); "'naked assertions devoid of further factual enhancement'" need not be accepted, Maldonado v. Fontanes, 568 F.3d 263, 266 (1st Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1949); and "[i]f the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal," Tambone, 597 F.3d at 442.

The district court found that of plaintiffs' main efforts to assert adequate claims, all three failed. The statute provides

-16-

the blueprint against which a claim must be measured and we start by outlining the requirements of section 11, which reads in relevant part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may . . . sue [enumerated defendants].

15 U.S.C. § 77k(a).

Here, plaintiffs properly alleged that they acquired securities pursuant to a registration statement, and defendants--which include the issuer and underwriters, as well as the directors of Nomura Asset and signers of the offering documents--are those enumerated in section 11.[8] Plaintiffs also alleged that misstatements or misleading statements were made and that they were "material," that is, that "'there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision." Milton v. Van Dorn Co., 961 F.2d 965, 969 (1st Cir. 1992) (emphasis omitted) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988)).

---

[8]Although the issuer is not explicitly mentioned in the list of enumerated defendants, because the issuer must always sign registration statements, 15 U.S.C. § 77f(a), issuers are permissible defendants under section 11(a)(1), which includes as defendants "every person who signed the registration statement," id. § 77k(a)(1). See 2 T. Hazen, The Law of Securities Regulation § 7.3[3], at 218 & n.49 (6th ed. 2009).

One qualification is important to understanding the district court's rulings.  Cautionary statements may "negate any reasonable reliance," 2 Hazen, supra, § 7.3[1][B], at 216; but this exception, known as the "bespeaks caution" doctrine, normally applies only to "forward-looking" statements such as projections or forecasts and not to "representation[s] of present fact." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996) (emphasis omitted), abrogated on other grounds by 15 U.S.C. § 78u-4(b)(2); 2 Hazen, supra, § 7.3[1][B], at 215 (citing cases).

This brings us to the individual charges of false or misleading statements and to the specific allegations of the complaint.  On this appeal, plaintiffs claim that three sets of allegations were adequately alleged: one relates to the lending guidelines, another to appraisal standards and a third to credit ratings.  The district court disagreed in each case, and we consider the adequacy of the allegations charge by charge.

The underwriting guidelines. Plaintiffs first point to a set of statements in the offering documents implying that the banks that originated the mortgages used lending guidelines to determine borrowers' creditworthiness and ability to repay the loans.  For example, the prospectus supplements for the two trusts at issue stated that First National Bank of Nevada ("FNBN"), one of the "key" loan originators for those trusts, used "underwriting guidelines [that] are primarily intended to evaluate the

prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral."[9]

In fact, plaintiffs allege, FNBN "routinely violated" its lending guidelines and instead approved as many loans as possible, even "scrub[bing]" loan applications of potentially disqualifying material. Indeed, plaintiffs allege that this was FNBN's "business model," aimed at milling applications at high speed to generate profits from the sale of such risky loans to others. Thus, plaintiffs say, contrary to the registration statement, borrowers did not "demonstrate[] an established ability to repay indebtedness in a timely fashion" and employment history was not "verified."[10]

Admittedly, warnings in the offering documents state, for example, that the "underwriting standards . . . typically differ from, and are . . . generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac"; that "certain

_____

[9]The prospectus supplements also stated that "FNBN employs or contracts with underwriters to scrutinize the prospective borrower's credit profile"; its guidelines "are applied in a standard procedure that is intended to comply with applicable federal and state laws and regulations"; "the prospective borrower must have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion"; and "employment history is verified through written or telephonic communication."

[10]Similar claims were made for another "principal originator" for one of the two trusts, Metrocities Mortgage, LLC, but the basis for such claims appears to be only that such claims were made against that company in other litigation. As we are here concerned only with whether the claim is adequately supported as to some of the mortgages, we need not pursue this issue further.

-19-

exceptions to the underwriting standards . . . are made in the event that compensating factors are demonstrated by a prospective borrower"; and that FNBN "originates or purchases loans that have been originated under certain limited documentation programs" that "may not require income, employment or asset verification."

The district court ruled that, read together with such warnings, the complained-of assurances were not materially false or misleading, but we cannot agree. Neither being "less stringent" than Fannie Mae nor saying that exceptions occur when borrowers demonstrate other "compensating factors" reveals what plaintiffs allege, namely, a wholesale abandonment of underwriting standards.[11] That is true too of the warning that less verification may be employed for "certain limited documentation programs designed to streamline the loan underwriting process." Plaintiffs' allegation of wholesale abandonment may not be proved, but--if accepted at this stage--it is enough to defeat dismissal.

Defendants say that no detailed factual support is provided for the allegation and that it is implausible. Despite the familiar generalization that evidence need not be pled at the complaint stage, see Twombly, 550 U.S. at 555, courts increasingly

---

[11]The same can be said about the warning that "[c]ertain [m]ortgage [l]oans were underwritten to nonconforming underwriting standards, which may result in losses or shortfalls to be incurred on the [o]ffered [c]ertificates." Using "nonconforming" standards is different than having no standards; and this statement makes it seem as though only some ("certain") loans were underwritten under these standards, leaving the impression that most other loans used "conforming" standards.

insist that more specific facts be alleged where an allegation is conclusory, see Maldonado, 568 F.3d at 266, 274; and the same is true for implausibility, at least where the claim is considered as a whole, Twombly, 550 U.S. at 570; see Arista Records LLC v. Doe 3, 604 F.3d 110, 119-21 (2d Cir. 2010).

"Conclusory" and "implausible" are matters of degree rather than sharp-edged categories. Iqbal, 129 S. Ct. at 1949; Twombly, 550 U.S. at 555. However, the practices alleged in this case are fairly specific and a number of lenders in the industry are widely understood to have engaged in such practices. The harder problem is whether enough has been said in the complaint--beyond conclusory assertions--to link such practices with specific lending banks that supplied the mortgages that underpinned the trusts. Similar complaints in other cases have cited to more substantial sources, including statements from confidential witnesses, former employees and internal e-mails.

This is a familiar problem: plaintiffs want discovery to develop such evidence, while courts are loath to license fishing expeditions. While this case presents a judgment call, the sharp drop in the credit ratings after the sales and the specific allegations as to FNBN offer enough basis to warrant some initial discovery aimed at these precise allegations. The district court is free to limit discovery stringently and to revisit the adequacy of the allegations thereafter and even before possible motions for

summary judgment.  See, e.g., Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 79 (1st Cir. 2008).

Appraisal practices.  The complaint also alleges that the offering documents contained false statements relating to the methods used to appraise the property values of potential borrowers--the ratio of property value to loan being a key indicator of risk.  For example, the April 19, 2006, registration statement and the prospectus supplements stated that "[a]ll appraisals" were conducted in accordance with the "Uniform Standards of Professional Appraisal Practice" ("USPAP").  These in turn require that appraisers "perform assignments with impartiality, objectivity, and independence" and make it unethical for appraisers, among other things, to accept an assignment contingent on reporting a predetermined result.

The complaint alleges in a single general statement that the appraisals underlying the loans at issue here failed to comply with USPAP requirements; but there is no allegation that any specific bank that supplied mortgages to the trusts did exert undue pressure, let alone that the pressure succeeded.  The complaint fairly read is that many appraisers in the banking industry were subject to such pressure.[12]  So, unlike the lending standard

_____

[12]The complaint cites the testimony of Alan Hummel, the Chair of the Appraisal Institute, before the Senate Committee on Banking that appraisers "experience[d] systemic problems with coercion" and a 2007 survey showing that such pressure was widespread.  How many succumbed and altered appraisals is not specified.

allegation, the complaint is essentially a claim that other banks engaged in such practices, some of which probably distorted loans, and therefore this may have happened in this case.

On this basis, virtually <u>every</u> investor in mortgage-backed securities could subject a multiplicity of defendants "to the most unrestrained of fishing expeditions." <u>Gooley</u> v. <u>Mobil Oil Corp.</u>, 851 F.3d 513, 515 (1st Cir. 1988); <u>see also</u> <u>DM Research, Inc.</u> v. <u>Coll. of Am. Pathologists</u>, 170 F.3d 53, 55 (1st Cir. 1999). Accordingly, we agree with the district court that such an allegation--amounting to the statement that others in the industry engaged in wrongful pressure--is not enough. Several other district courts have reached precisely this conclusion.[13]

<u>Investment ratings</u>. The prospectus supplements set forth ratings that Standard & Poor's Rating Services, Inc. ("S&P") or Moody's Investor Services, Inc. ("Moody's") had assigned to the certificates or stated that the certificates would not be offered unless they received an "investment grade" rating from S&P (AAA through BBB) or Moody's (Aaa through Baa3). There is no claim that

---

[13]<u>See</u> <u>In re IndyMac Mortgage-Backed Sec. Litig.</u>, 718 F. Supp. 2d 495, 510 (S.D.N.Y. 2010) (based on plaintiffs' complaint, there was no reason to infer "that the appraisers of the properties underlying the [c]ertificates . . . succumbed to [pressure] in any way that violated USPAP"); <u>accord</u> <u>Boilermakers Nat'l Annuity Trust Fund</u> v. <u>WaMu Mortg. Pass Through Certificates, Series AR1</u>, No. C09-00037MJP, 2010 WL 3815796, at *7 (W.D. Wash. Sept. 28, 2010); <u>Tsereteli</u> v. <u>Residential Asset Securitization Trust 2006-A8</u>, 692 F. Supp. 2d 387, 393 (S.D.N.Y. 2010). <u>But cf.</u> <u>In re Wells Fargo Mortg.-Backed Certificates Litig.</u>, 712 F. Supp. 2d 958, 972 (N.D. Cal. 2010).

the ratings given were misreported or that the "unless" condition was not met. Rather, plaintiffs say that these ratings were misleading, primarily because they were based on "outdated models, lowered ratings criteria, and inaccurate loan information."

The ratings are opinions purportedly expressing the agencies' professional judgment about the value and prospects of the certificates. See In re Credit Suisse First Bos. Corp., 431 F.3d 36, 46-47 (1st Cir. 2005), overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007). An opinion may still be misleading if it does not represent the actual belief of the person expressing the opinion, lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement. Id. at 47; accord In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989), cert. denied, 496 U.S. 943 (1990). Liability may on this theory also extend to one who accurately described the opinion.[14]

The complaint includes acknowledgments from S&P and Moody's executives conceding, in hindsight, that the models and data that the rating agencies were using were deficient. But the ratings were not false or misleading because rating agencies should

---

[14]See Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 175-76 (1st Cir. 1994) (underwriters, directors and advisors can be held liable for accurately reporting study by an underwriter not party to the suit that, although literally true, could nevertheless be misleading); cf. 2 A.A. Sommer, Federal Securities Act of 1933 § 9.02[12][d], at 9-24 (rev. ed. 2010) (underwriters, directors, officers and issuers can be held liable for statements of experts included in registration statements).

have been using better methods and data. Defendants are not liable under the securities laws when their opinions, or those they reported, were honestly held when formed but simply turn out later to be inaccurate; nor are they liable only because they could have formed "better" opinions. See Boilermakers, 2010 WL 3815796, at *7. A majority of district courts that have considered the issue have dismissed similar claims, and the Sixth Circuit affirmed one such dismissal.[15]

In addition to claiming that the ratings were faulty, the complaint also alleges that the ratings agencies produced high ratings aimed at keeping business, and it quotes individuals at the rating companies to support that proposition and to suggest that some inside the company thought that ratings were skewed.[16] But, tellingly, the complaint stops short of alleging expressly that the leadership of S&P or Moody's believed that their companies' ratings were false or were unsupported by models that generally captured the quality of the securities being rated.

---

[15]E.g., J & R Mktg., SEP v. Gen. Motors Corp., 549 F.3d 384, 392-93 (6th Cir. 2008); Boilermakers, 2010 WL 3815796, at *7 ("The mere fact that the ratings would have been different under a different methodology is insufficient to state a claim."); IndyMac, 718 F. Supp. 2d at 511-12; Tsereteli, 692 F. Supp. 2d at 395. But see Wells Fargo, 712 F. Supp. 2d at 973.

[16]The strongest examples are from an S&P managing director now admitting that S&P intentionally inflated ratings and that he "knew it was wrong at the time" but did it because "[i]t was either that or skip the business" and from a CEO of Moody's reportedly saying to his board in 2007 that Moody's was pressured to rate higher and that sometimes they "drink the kool-aid."

The line is admittedly a fine one, but the ratings--inherently opinions and not warranties against error, J & R Mktg., 549 F.3d at 392-93--were accurately reported by defendants and nothing more is required so long as the ratings were honestly made, had some basis, and did not omit critical information. That a high rating may be mistaken, a rater negligent in the model employed or the rating company interested in securing more business may be true, but it does not make the report of the rating false or misleading. If the purchaser wants absolute protection against errors of opinion, the answer is insurance rather than lawsuits.

As sections 11 and 12 are structured, there is liability without fault even for those who merely report the statements or opinions of others; under section 11 this liability for the issuer is absolute; for other defendants (including the issuer under section 12), a defense is available for reporting statements of others if due diligence was exercised. See 15 U.S.C §§ 77k(a)-(b), 77l(a)(2).[17] Either way, the absence of a scienter element may suggest special caution before classifying an accurate report of a third-party opinion as "misleading" based on implied representations about subjective intent or qualifications known only to the third party.

---

[17]See 2 Sommer, supra, § 9.02[12][d], at 9-24; see also In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 660-61 (S.D.N.Y. 2004) (underwriters can be liable for false and misleading public filings made by issuer and accountants that were incorporated into registration statement).

Seller or solicitor allegations. Section 12(a)(2) permits a plaintiff to sue only a defendant who either sold its own security to the plaintiff or (for financial gain) successfully solicited the sale of that security to the plaintiff. Pinter, 486 U.S. at 642-47, 650 & n.21. The district court dismissed plaintiffs' section 12(a)(2) claims, concluding that they did not adequately allege that defendants sold the certificates to the plaintiffs or solicited the sales. This was apparently because the complaint used a more ambiguous phrase--that plaintiffs "acquired the [c]ertificates pursuant and/or traceable to" the offering documents--found insufficient by a number of courts. E.g., Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc., 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010); Wells Fargo, 712 F. Supp. 2d at 966.

But the complaint also alleged that plaintiffs "acquired . . . [c]ertificates from defendant Nomura Securities" and that the "[d]efendants promoted and sold the [c]ertificates to [the p]laintiffs and other members of the [c]lass" (emphasis added); these allegations are sufficient to state a claim under section 12(a)(2) so long as material misstatements or misleading omissions are alleged. The district court's dismissal of plaintiffs' section 12(a)(2) claims for failure to allege defendants' requisite connections with the sale was in error.

Control person liability. Finally, the district court dismissed plaintiffs' section 15 "control person" liability claims

-27-

because it held that plaintiffs failed to state a violation of the securities laws to begin with. Section 15 creates liability for any individual or entity that "controls any person liable" under sections 11 or 12. 15 U.S.C. § 77o; see Shaw, 82 F.3d at 1201 n.2. Because we hold that plaintiffs adequately stated some claims under sections 11 and 12(a)(2), we also hold that the district court's dismissal of plaintiffs' section 15 claim was in error. Given the "highly factual nature" of the control person inquiry, resolving that issue on a motion to dismiss is often inappropriate. 2 Hazen, supra, § 7.12[2], at 343 n.38.

We affirm the dismissal of all claims based upon purchases of the AR1, AR2, AF2, AR3, AR4 and WF1 trusts and all defendants including those six trusts implicated only as to their certificates. As to claims against the AF1 and AP1 trusts and other remaining defendants, we affirm the dismissal of all claims save those relating to the statements regarding the lending banks' underwriting practices but vacate the dismissal of the latter claims and remand for further proceedings consistent with this decision. Each party will bear its own costs on this appeal.

It is so ordered.

-28-