Billings, Thomas P., J.
This consolidated action arises from defendants’ offers and sales of residential mortgage backed securities (“RMBS”). As assignee of the claims of nine of its clients, Cambridge Place Investment Management, Inc. (“CPIM” or “plaintiff’) seeks damages and/or rescission of the securities transactions from the defendants, who are underwriters, dealers, and depositors of the securities at issue. CPIM alleges that the defendants made false and/or misleading statements in their offers to sell residential mortgage-backed securities, in violation of the Massa *595 chusetts Uniform Securities Act (“the Act”), G.L.c. 110A, §410.[2]
The defendants have moved jointly to dismiss the plaintiffs amended complaints for failure to state a claim. For the following reasons, the defendants’joint motion is ALLOWED in part and DENIED in part.
BACKGROUND
The Complaints, whose 732 numbered paragraphs (each) are greatly condensed here, allege the following facts, among others. These allegations are taken as true, and all reasonable inferences drawn therefrom in the plaintiffs’ favor. See, e.g., Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998); Marshall v. Stratus Pharmaceuticals, Inc., 51 Mass.App.Ct. 667, 670-71 (2001).
A.The Securitization Process
RMBS are securities backed by residential mortgage loans, entitling investors to a predetermined portion of the principal and interest payments made by the borrowers of those loans. The process by which RMBS are created involves multiple steps.
First, lenders (the “originators”) originate mortgage loans to borrowers buying homes or refinancing existing mortgages. A “sponsor” or “seller” — an entity that has originated the loans or acquired them from other mortgage originators — then aggregates the mortgages into a loan pool, which usually consists of thousands of loans,[3] and sells the pool to a “depositor.”
The depositor then transfers, or deposits, the pool into an issuing trust, where the loans are divided into “tranches.”[4] The trust then issues certificates to the depositor, which in turn sells them to underwriting financial institutions (the “underwriters” or “Wall Street Banks”) for resale to investors.
The cash flow in the form of payments by the underlying borrowers is then “passed through” to the securities holders. The certificates, which represent an interest in the trust, or loan pool, are considered securities under state and federal securities laws.
The mortgage securitization process thus shifts the risk of loss from the mortgage originator, or lender, to the investors who buy RMBS. Because the certificates are backed by the underlying mortgages, their value depends on the abilify of the mortgagors to repay the loan principal and interest, and the adequacy of the collateral in the event of a default.
RBMS are marketed through “offering documents” prepared by the underwriters. These include, in a public offering, a registration statement, prospectus, and prospectus supplements filed with the Securities and Exchange Commission; in a private placement, there is a private placement memorandum. The underwriters also provided potential buyers (including the plaintiff) with additional materials, including “term sheets, pooling and servicing agreements, data, computational material, data regarding the LTV [loan-to-value] and debt-to-income ratios of the pools, computer models of the financial structures of the securitizations, tabular sensitivity data, loan tapes, rating agency expected loss levels, emails, sampling data regarding credit/compliance/appraisal and due diligence, ‘kickout’ criteria and data,[5] and collateral characteristics. ”
B.Historical Allegations
According to the complaints, in the 1980s and 1990s most mortgage securitizations were conducted by government-sponsored agencies, such as Freddie Mac and Fannie Mae, as well as wholly private entities, all of which generally had high credit qualify as well as strict underwriting guidelines. Beginning in 2001, however, private-sector loan securitizations increased dramatically. This increase was accompanied by widespread violations by the originators of their underwriting and appraisal standards, in particular with respect to sub-prime mortgage loans. It became common in the industry to issue loans that were inherently risky and susceptible to defaults and delinquencies, including accepting without verification the borrowers’ stated income (known in the industry as “liar loans”), issuing loans without any disclosure of the borrowers’ income or assets (“NINA” or “No Income, No Asset” loans), and making loans without any documentation as to income, assets or employment history (“No Doc” loans).
Underwriting financial institutions that profited from the securitizations sought increasing volumes of mortgage loans from the originators who, exercising their increased bargaining power, demanded that the underwriters limit their qualify control reviews to a smaller percentage of loans. As a result, the underwriters performed “increasingly cursory due diligence” of the mortgage loans they securitized, which was only exacerbated by the volume and pace of the securitization business.
C.The RBMS Purchases in These Cases
CPIM is a Delaware corporation with its principal place of business in Concord, Massachusetts. CPIM, together with its affiliates, served as investment manager responsible for sourcing, review, analysis, and purchase decisions regarding investments in American markets for its clients. As such, CPIM exercised complete and discretionary investment authorify in reviewing investments, and negotiating and concluding transactions with broker dealers.
The defendants are divided into two categories: the Wall Street defendants and the depositor defendants. The Wall Street defendants are the underwriting financial institutions; the depositor defendants are the entities that acquired the loan pools, securitized them, and sold them to the Wall Street defendants. See discussion, supra. Between 2005 and 2008, the sixteen Wall Street defendants offered 300 certificates that the plaintiff then sold to its clients at an aggregate *596 price of over $3.2 billion. The majority — about 70% — of the loans backing these securities were made by eight originators who are now notorious as sub-prime lenders and have all failed,[6] or from defendant Countrywide Securities Corporation (“Countrywide”), which originated most of its own mortgage loans through its affiliates. These originators violated their own stated underwriting guidelines and did not consistently evaluate the borrowers’ ability to repay the loans, made bad loans based on untrue and unverified application information, and relied on inflated appraisals which caused the listed LTV ratios (and thus the level of risk) to be untrue; also, the loan pools included higher - than-stated numbers of investment and second home properties.
Nonetheless, the Wall Street defendants represented to CPIM in face-to-face meetings, electronic communications, and “pitch books” (which CPIM was not allowed to retain) that they had performed careful due diligence regarding the loans and the originators’ underwriting practices.
These documents contained numerous statements of material facts about the Securities, including statements concerning: (1) the mortgage originators’ underwriting guidelines that were purportedly applied to evaluate the ability of the borrowers to repay the loans underlying the Securities; (2) the appraisal guidelines that were purportedly applied to evaluate the value and adequacy of the mortgaged properties as collateral; (3) The LTV ratios, debt to income ratios, and purported occupancy status of the mortgaged properties, including whether the properties were “owner occupied,” “second homes,” or “investment properties”; (4) the Wall Street Banks’ due diligence of the loans and the mortgage originators’ underwriting practices; (5) various forms of credit enhancement[7] applicable to certain tranches of Securities; and (6) whether the issuing trust for each offering had obtained good title to the mortgage loans comprising the pool for the offering.
Based on these representations and other offering documents, CPIM advised nine foreign hedge funds (the “clients”) to purchase the residential mortgage backed securities now at issue. However:
These statements of material fact were false because: (1) the mortgage originators violated their stated underwriting guidelines and did not consistently evaluate the borrowers’ ability to repay the loans; (2) inflated appraisals caused the listed LTV ratios and levels of credit enhancement to be untrue; and (3) the actual numbers of riskier “second home” and “investment property” mortgagees were higher than the stated numbers. In addition, metrics such as debt-to-income ratios were untrue as a result of the mortgage originators’ acceptance of untrue information from mortgage applicants.![8]]
Beginning in the fall of 2006, housing prices began to decline and delinquencies began to increase. Subsequent years saw the largest national decline in home prices since the depression; delinquencies, foreclosures, and loan deficiencies rose dramatically; RBMS suffered commensurately; and the nine foreign hedge funds sustained substantial losses as a result.
D. Procedural History
CPIM purchased from its clients all of their claims relating to the offer and sale of the securities that are the subject of the complaints, and is the exclusive, absolute, total, and irrevocable assignee of those claims and the exclusive attomey-in-fact for the clients who assigned them.
After CPIM filed its first action (SUCV 2010-2741-BLS1) in this court on July 10, 2010, the defendants removed the case to the United States District Court for the District of Massachusetts. While that case was pending, CPIM filed the second complaint (SUCV 11-0555-BLS1) in this court on February 11, 2011. Following jurisdictional discovery, the District Court granted CPIM’s motion to remand the 2010 action, and the cases were consolidated. On March 12, 2012, this court (Lauriat, J.) denied the defendants’joint motion to dismiss for lack of standing [30 Mass. L. Rptr. 163],
The defendants now move to dismiss the amended complaints in their entirety pursuant to Mass.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief may be granted. They advance five arguments in support of their motion:
That CPIM does not have a sufficient nexus to Massachusetts to invoke the protections of the Act;
That even if the Act were to apply, the plaintiffs claims must be brought under the laws of the states where the defendants undertook the securitizations and sales efforts, some of which have shorter limitations periods under their applicable Blue Sky laws;
That the complaints fail to plead any actionable misstatements or omissions of material fact;
That the depositor defendants are not statutory sellers and thus cannot be liable under the Act; and
That on the facts alleged, none of the defendants are liable for claims relating to RMBS purchased from others in the secondary market.
DISCUSSION
1. Standard on a Motion to Dismiss
To withstand a Rule 12(b)(6) motion to dismiss, a plaintiffs complaint must contain “allegations plausibly suggesting (not merely consistent with) an entitlement to relief, in order to reflect [a] threshold requirement . . . that the plain statement possess enough heft to sho[w] that the pleader is entitled to relief.” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007) (internal quotations omitted). *597 While a complaint need not set forth detailed factual allegations, a plaintiff is required to present more than labels and conclusions, and must raise a right to relief “above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact).” Id. Although motions to dismiss are addressed to the face of the complaint, the court may consider documents attached or incorporated by reference as well as legally required disclosure documents and documents known or possessed by the plaintiff on which it relied in bringing the action. Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Sup.2d 387, 390 (S.D.N.Y. 2010).
2. The Massachusetts Uniform Securities Act
Section 410(a)(2) of the Massachusetts Uniform Securities Act imposes civil liability on any person who:
offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission
G.L.c. 110A, §410(a)(2). The Act tracks its federal counterpart and seeks to serve the same purposes. Compare G.L.c. 110A, §301 with 15 U.S.C. §77e, and G.L.c. 110A, §101 with 15 U.S.C. §78(b); see also G.L.c. 110A, §415 (“This chapter shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation”). The Act also has an aiding-and-abetting provision in section 410(b), explored in Part 6, infra.
“One of the cardinal purposes of the [Federal] Securities Act [of 1933] was to slow down [the] process of rapid distribution of corporate securities, at least in its earlier and crucial stages, in order that dealers and investors might have access to, and an opportunity to consider, the disclosures of the material business and financial facts of the issuer provided in registration statements and prospectuses.” In the matter of Carl M. Loeb, Rhoades & Co., 38 S.E.C. 843, 848 (1959). “The overarching strategy of the 1933 act was to protect investors by requiring the disclosures that were necessary for informed decision-making.” Bulldog Investors Gen. Partnership v. Secretary of the Commonwealth, 460 Mass. 647, 652 (2011) (Bulldog II).
To state a claim under §410(a)(2) of the Act, the plaintiff must “establish that (1) the defendant ‘offer[ed] or [sold] a security’; (2) in Massachusetts; (3) by making ‘any untrue statement of a material fact’ or by omitting to state a material fact; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant knew, or ‘in the exercise of reasonable care [would] have known,’ of the untruth or omission.”[9] Marram v. Kobrick Offshore Funds, Ltd., 442 Mass 43, 52 (2004) (footnote omitted), quoting G.L.c. 110A, §410(a) (2). “A fact is material... if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.” Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 485 (2nd Cir. 2011).
In contrast to a common-law fraud claim and in keeping with the Act’s “consumer-oriented focus,” the plaintiff/buyer need not prove reliance, scienter, negligence, or loss causation; nor is it material that the buyer may be sophisticated or may have failed to investigate or verify a statement’s accuracy. Marram at 53. “The buyer needs only to show lack of knowledge of a misleading statement or omission in order to prevail.” Id. at 53-54 (internal quotations and citations omitted).
3. Nexus to Massachusetts
The defendants lead off with the argument that “CPIM’s allegations are facially insufficient under MUSA, which requires a plaintiff to establish that its claims arise out of an offer or sale ... in the commonwealth ...” This, the “nexus” argument, fails for three reasons.
First, in furtherance of their statutory objectives, both the federal statute and the Act define “offer” broadly as “every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value.” 15 U.S.C. 77a (3); G.L.c. 110A, §401(i)(2). Under the Act, the definition of “offer” “includes not only offers that originate within the Commonwealth but also ones directed into the Commonwealth and received at the place to which they are directed.” Bulldog Investors Gen. Partnership v. Secretary of the Commonwealth, 457 Mass. 210, 216 (2010) (Bulldog I). See G.L.c. 110A, §414(c).[10] Federal case law and SEC decisions have made it clear that an offer extends beyond the common-law contract concept to include publicity efforts intended to arouse public interest. Carl M. Loeb, Rhoades & Co., 38 S.E.C. at 850; SEC v. Cavanaugh, 155 F.3d 129, 135 (2nd Cir. 1998); Hocking v. Dubois, 885 F.2d 1449, 1457-58 (9th Cir. 1989) (“it is worth noting that the term ‘offer’ has a different and far broader meaning in securities law than in contract law”); Bulldog II, 460 Mass. at 653 (“offers are not limited to communications which constitute an offer in the common law contract sense, or which on their face purport to offer a security... they include any document which is designed to procure orders for a security”) (internal quotations and citations omitted).
That the actual sale transaction itself did not take place in Massachusetts is of no moment; it is a violation of the Act to make a misleading offer in or into *598 Massachusetts, whether or not it results in a sale. See Bulldog I, 457 Mass. at 211 (“Unlike at common law, where the definition of an offer includes only communications to which an offeree’s affirmative response would conclude a bargain, the act defines an ‘offer’ more broadly to include the ‘solicitation of an offer.’ Thus, the plaintiffs violated the act by sending to a Massachusetts resident materials soliciting an offer to purchase unregistered securities” (internal citations omitted)). Here, the complaint asserts that the Wall Street defendants offered securities to the plaintiff in face-to-face meetings in Massachusetts on specified dates, and by sending documents and making telephone calls to the plaintiff in Massachusetts. Under Bulldog I and Bulldog II, that is more than sufficient for the purposes of a motion to dismiss.[11]
Second, an entfiy does not have to be a purchaser to invoke the protections of the Act. While jurisdictions have differed in this regard, the United States District Court for the District of Massachusetts has adopted a functional test, under which an investment advisor who has unrestricted decision making authority on behalf of its clients qualifies as a purchaser. See, e.g., In re Sonus Networks, Inc. Sec. Litig., 247 F.R.D. 244, 250-51 (D.Mass. 2007), and cases cited. This test is consistent with the expansive construction given the Massachusetts Act, and I adopt it.
The defendants, however, citing investment management agreements between CPIM UK, a London-based arm of CPIM, and CPIM, take the position that CPIM was only an “independent contractor” to CPIM UK. Therefore, they reason, CPIM was involved only indirectly with the purchases of the securities and cannot be considered an “investment advisor.”
The Act defines an “investment adviser” as “any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities.” G.L.c. 110A, §401(m). The agreement cited by the defendants provided, in pertinent part, that CPIM was to identify investment opportunities for clients and customers of CPIM UK but only to CPIM UK; provide investment and credit analysis, monitoring and review of investments; and negotiate and conclude investment transactions with registered broker dealers. Therefore, according to the defendants, CPIM UK is the investment manager.
CPIM has, however, provided multiple investment management agreements between itself and CPIM UK which permit CPIM UK to delegate any of its functions to an associate, defined to include CPIM. See Vol. 16, Ex. 1, §§1.3.5, 24.1; see also Vol. 16, Exs. 2-9 (containing substantially the same language). The complaint has sufficiently alleged that CPIM acted as an investment advisor to the nine hedge funds at issue and was thus a “purchaser” under the Act. To the extent that there are outstanding factual questions as to CPIM’s role, the issue is not ripe for a determination at this stage of the litigation.
Finally, it is undisputed that CPIM purchased from its clients all of their claims related to the offer and sale of securities and is thus the assignee of, and exclusive attorney-in-fact for those claims. “[T]o the exdent an investment advisor seeks to claim losses suffered by its clients in a bid to qualify as lead plaintiff, the investment advisor must show that its clients specifically authorized it to bring securities law claims on their behalf.” HCL Partners Ltd. Partnership v. Leap Wireless Int’l Inc., 2008 U.S. Dist. LEXIS 43615 at *11 (S.D.Cal.) (May 22, 2008). That has been done here.
4. Statute of Limitations
The defendants next argue that the states in which the securitization and sales activities occurred have a more significant relationship with this case than does Massachusetts, and that their Blue Sky laws — not that of Massachusetts — should therefore control. Because the Blue Sky laws of many of those states apply a shorter statute of limitations and/or statute of repose, the reasoning goes, the plaintiffs claims are time-barred. [12] The defendants point to public “storm warnings” in the form of media coverage of the mortgage crisis and similar lawsuits filed by RMBS investors against many of the defendants here, which put the plaintiff on notice at the earliest by July 2007, and at the latest by July 2009, of the facts that give rise to these claims. Therefore, the defendants argue, the plaintiffs claims are time-barred under the various statutes of limitations. Similarly, the plaintiffs claims are time-barred in those states with a statute of repose, which begins to run on the date of purchase.
The problem with the defendants’ argument is that it relies on a traditional conflict of laws analysis to arrive at the conclusion that the Blue Shy laws of other states should apply, to the exclusion of the Massachusetts Act. Conflict of law rules, however, “are often developed to facilitate a choice between dissimilar, sometimes competing common law provisions of different states.” Barnebey v. E.F. Hutton, 715 F.Sup. 1512, 1535-36 (M.D.Fla. 1989). As the term suggests, a conflict of laws analysis is unnecessary absent an actual conflict between the laws of two (or more) jurisdictions. Blue Sky laws, on the other hand, seek to serve similar goals. Id. at 1535. The United States District Court for the Western District of Virginia concluded in Lintz v. Carey Manor Ltd., 613 F.Sup. 543, 549 (W.D.Va. 1985), that a “territorial” approach best serves the multiple policy objectives behind state securities laws. As the court noted:
There would appear to be two policy bases that could be used by a state for enacting a state securities act. First, the state has a legitimate interest in protecting its citizens in the purchase or sale of *599 securities. The state likewise has a legitimate interest in regulating and controlling securities activities deemed to have taken place at least partially within the borders of the state. In most cases these policy bases will overlap and lead to the same conflict of laws conclusions.
Id. (internal quotations and citations omitted).
Given that most state securities laws are enacted for both reasons, “as long as there is some territorial nexus to a particular transaction, the laws of two or more states may simultaneously apply.” Id. at 550. Nonetheless, the “nexus” analysis, while “helpful as a guide to when a transaction occurs within this state so that the statute is applicable [is] in no sense ... a conflicts provision, nor should it be.” Id. The Lintz court explained:
I see no reason why a conflicts of law problem develops if one Blue Sky law provides fewer remedies, lacks an attorneys’ fee provision, has a shorter statute of limitations or has a more limited scope than the law of another state. Just as the same act can violate both federal and state statute as well as state common law, so too can it violate several Blue Sky laws simultaneously. There is nothing inconsistent in trying a securities case on multiple theories, and determining liability under each statute that is applicable, so long as the plaintiff is prevented from multiple recoveries.
Id. at 551. The Lintz holding has seen general acceptance in the quarter-century since,[13] and I adopt it.
Because there is no reason to apply a traditional conflict of laws analysis, the next step is to determine whether the transactions at issue have a sufficient territorial nexus with Massachusetts so as to permit the application of the Massachusetts securities statute. Lintz, 613 F.Sup. at 546; see also Barnebey, 715 F.Sup. at 1536. As discussed above, the complaint alleges that the defendants made offers in Massachusetts directed to CPIM, a Massachusetts entity acting as an investment advisor to clients. Most of the defendants either have offices in Massachusetts and/or were licensed to sell securities in Massachusetts. “Massachusetts has a strong interest in adjudicating violations of Massachusetts securities law.” Bulldog I, 457 Mass. at 218. The defendants have pointed to no other state that has an interest that outweighs that of the Commonwealth in adjudicating the plaintiffs claims. The facts here are thus sufficient to establish that the transactions had a territorial nexus to Massachusetts. The Act’s four-year statute of limitations therefore applies, meaning that the plaintiffs claims are not time-barred, at least for purposes of this motion to dismiss.
5. Count I Against the “Direct Seller” Wall Street Banks
Count I asserts claims under section 410(a)(2) against the Wall Street Banks who offered or sold the RBMS in Massachusetts to CPIM and/or its clients. At the most basic level the plaintiffs claims, with the exception of its claim that the Wall Street defendants failed to conduct due diligence, turn on whether the underlying loan originators’ conduct differed from that described in the offering documents. In large part, therefore, the spotlight is on the conduct of the mortgage originators, which are not parties to the case but in many cases were affiliates of parties.[14] The complaints assert similar facts with respect to originators Accredited and American Home Mortgage, supported by confidential witness statements and complaints in other actions, internal emails and documents. See ¶¶251-271. The allegations regarding Aames, DLJ Mortgage Capital, Equifirst and “the other mortgage originators whose loans were included in the securitizations in which the Defendants underwrote, offered or sold Securities to Plaintiff’ are made “on information and belief.” ¶272.
The defendants assert that the complaints “improperly rely on flawed presumptions and suffer from a litany of fatal pleading errors”; specifically, the “false premise” that the offering documents made “definitive representations” that all of the underlying mortgages met specified standards; a “fail[ure] to allege facts indicating that any of the alleged defects beset any of the Certificates at issue in these Actions”; “reli[ance] on generalized conclusoiy allegations with no specific connection to the Offerings at issue”; and “reli[ance] on improper allegations lifted directly from other complaints and administrative proceedings without any independent verification by CPIM.” These arguments are then adapted to the plaintiffs claims of misrepresentation with respect to underwriting guidelines, LTV ratios and appraisal standards, owner-occupancy rates, debt-to-income ratios, assignment and transfer of mortgages, the underwriters’ own due diligence, and credit enhancements.
A. Reliance on Complaints, Investigations, and other Proceedings
To begin with the last of the defendants’ general arguments: federal courts have differed as to whether a plaintiff may include in its complaint allegations set forth in complaints filed in separate lawsuits. For example, in Maine State Retirement Sys. v. Countrywide Fin. Corp., 2011 WL 4389698 at *20 (C.D.Cal. May 5, 2011), the United States District Court for the Central District of California allowed the defendant’s motion to strike those portions of the complaint that relied on complaints in other actions. The court noted that the plaintiffs themselves were obligated to investigate those allegations, meaning speaking to the sources, examining the documents, and contacting the attorneys. Id. Similarly, in RSM Prod. Corp. v. Fridman, 643 F.Sup.2d 382, 403 (S.D.N.Y. 2009), the court allowed a motion to strike complaints from two other actions because they were “preliminary steps in litigations . . . that did not result in an adjudication *600 on the merits or legal permissible findings of fact, [they] are immaterial as a matter of law.” See also Footbridge Ltd. v. Countrywide Hope Loans, Inc., 2010 WL 3790810 (S.D.N.Y. Sept 28, 2010) (citing RSM Prod.].
Several courts have concluded otherwise. As the United States District Court for the Southern District of New York noted, addressing the conclusion in RSM Prod.:
Neither Circuit precedent nor logic supports such an absolute rule. Not all complaints are created equal — while some barely satisfy the pleading requirement, others are replete with detailed factual information of obvious relevance to the case at hand ... It makes little sense to say that information from such a study [cited in a complaint] — which the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony— is immaterial simply because it is conveyed in an unadjudicated complaint. The other complaints on which the [complaint] relies are of a similar character. Accordingly, the Court will not strike references to them from the [complaint].
In re Bear Stearns Mortgage Pass-Through Certificates Litig., 2012 WL 1076216 at *16 n.24 (S.D.N.Y. March 30, 2012) [“Bear Stearns"). See also Federal Housing Finance Agency v. UBS Americas, Inc., 2012 WL 1570856 at *20 (S.D.N.Y. May 4, 2012) (“FHFA") SEC v. Lee, 720 F.Sup.2d 305, 241 (S.D.N.Y. 2010) (there is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings in a complaint, and “reliance on the SEC and CFTC allegations does not demonstrate that [the complaint] lacks evidentiary support, but rather provides it with the necessaiy evidentiaiy support”); In re TJX Co. Retail Sec. Breach Litig., 564 F.3d 489, 497 (1st Cir. 2009) (“Where, as here, a substantial body of FTC complaints and consent decrees focus on a class of conduct, it is hard to see why a court would choose flatly to ignore it”); In re Beacon Assocs. Litig., 745 F.Sup.2d 386, 393 n.2 (S.D.N.Y. 2010) (New York Attorney General complaint).
The reasoning of the latter group of decisions is the more persuasive. Rule 11 requires only that the signing attorney have read the pleading and that s/he be able to certify “that to the best of his knowledge, information, and belief there is a good ground to support it; and that it is not interposed for delay.” If these requirements are satisfied, it should not matter that a fact is in the public domain, or even that it is as yet unadjudicated (such is, after all, the nature of a complaint).
The complaints in these cases assert that the plaintiffs “information and belief are based on the investigation conducted by and through counsel . . . [including] interviews with confidential witnesses; documents filed in connection with investigations and actions brought by the [SEC]” and other governmental agencies and private litigants, as well as testimony before the Financial Crisis Inquiiy Commission (FCIC) and its published conclusions. Therefore, the plaintiff has satisfied the requirement set forth in Maine State of conducting its own investigation.
Finally, to the extent that the complaint relies on news reports and other public information for general allegations not directly related to the claims presented here, “neither a [trial] court nor an appellate court should decide to strike a portion of the complaint — on the grounds that the material could not possibly be relevant — on the sterile field of the pleadings alone.” Footbridge, 2010 WL 3790810 at *6.
B. Underwriting Guidelines
The complaint asserts that the offering documents represented that the originators made the underlying loans in accordance with the accepted underwriting standards and practices. As a representative example, New Century originated mortgage loans that included, in the pools, securitization ABSHE 2004-HE1.[15] Asset Backed Securities Corporation was the depositor defendant and Credit Suisse the Wall Street bank underwriter defendant. The prospectus, dated March 30, 2004, and the prospectus supplement, dated October 4, 2004, for that particular pool contain the following statements:
The originator’s underwriting standards are primarily intended to assess the value of the mortgaged property and to evaluate the adequacy of that property as collateral for the mortgage loan and the applicant’s credit standing and ability to repay. The originator provides loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines but who generally have equity in their property. While the primary consideration in underwriting a mortgage loan is the value and adequacy of the mortgaged property as collateral, the originator also considers, among other things, a mortgagor’s credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property.
The Mortgage Loans will have been originated in accordance with the New Century Underwriting Guidelines. On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the Mortgage Loans will représent these exceptions.
Exceptions. As described above, the foregoing categories and criteria are guidelines only. On a case by case basis, it may be determined that an applicant warrants a debt service to income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc. An exception may be allowed *601 if the application reflects compensating factors, such as: low loan-to-value ratio; pride of ownership; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant’s monthly aggregate mortgage payment by 25% or more. Accordingly, a mortgagor may qualify in a more favorable risk category than, in the absence of compensating factors, would satisfy only the criteria of a less favorable risk category. It is expected that a substantial portion of the Mortgage Loans will represent these kinds of exceptions.
The plaintiff argues that the above statements were false or misleading where the originators “systematically disregarded underwriting guidelines, issuing loans to unqualified borrowers, loans supported by inflated appraisals, and ‘exception’ loans that lacked the appropriate compensating factors.” Because the Wall Street defendants had business relationships with the originators, had access to their mortgage originator personnel and documentation, and conducted their own due diligence they were aware, or reasonably should have been aware, of the originators’ wholesale abandonment of underwriting guidelines.
The defendants advance four arguments in support of their position that the plaintiffs allegations are insufficient to state a claim. First, they contend that the offering documents disclosed all the information that the plaintiff asserts was misrepresented or omitted — that the certificates were backed by high-risk loans originated by flexible underwriting guidelines, and that securitizations might include a substantial number of loans approved by underwriting exceptions based on subjective compensating factors. Otherwise put, the offering documents stated that the originators could and would make exceptions to their underwriting criteria. As an example, the defendants point to a portion of a prospectus supplement offered by underwriter Credit Suisse, regarding Long Beach, the originator, which reads:
There can be no assurance that every Mortgage Loan was originated in conformity with the applicable underwriting guidelines in all material respects. Long Beach’s underwriting guidelines include a set of specific criteria pursuant to which the underwriting evaluation is made. The application of Long Beach’s underwriting guidelines does not imply that each specific criterion was satisfied with respect to every Mortgage Loan. Rather, a Mortgage Loan will be considered to be originated in accordance with a given set of underwriting guidelines if, based on an overall qualitative evaluation, the Mortgage Loan is in substantial compliance with those underwriting guidelines. For example, a Mortgage Loan may be considered to comply with a set of underwriting guidelines, even if one or more specific criteria included in those underwriting guidelines were not satisfied, if other factors compensated for the criteria that were not satisfied or if the Mortgage Loan is considered to be in substantial compliance with the underwriting guidelines.
Second, the defendants contend that CPIM has failed to allege facts plausibly suggesting that the originators actually deviated from their underwriting guidelines, because it has not connected its underwriting allegations to the loans backing the certificates at issue. Third, the defendants reiterate their assertion that unadjudicated allegations in complaints and administrative proceedings are insufficient to support CPIM’s claims. Finally, they argue that after-the-fact loan delinquency and foreclosure data are not proof of an earlier misrepresentation; the later failure of the housing market, they say, cannot be proof of earlier deviations from underwriting standards.
With respect to the defendants’ first argument, the type of cautionary statements in the offering documents upon which they rely do not assist their cause. As the court noted in Bear Stearns, 2012 WL 1076216 at *16-17, the “bespeaks caution” doctrine only applies “where a plaintiff alleges that the defendant made misleading statements about the possibilify of that future, unforeseen events could undermine an investment’s value; it does not apply to cases . . . where a plaintiff alleges omissions or misrepresentations of historical fact — i.e., that the underwriting standards were followed.” See also Plumbers’ Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762 at 772 (1st Cir. 2011) (“Nomura”) (cautionary statements normally apply only to “forward-looking” statements, not to “representation[s] of present fact”).
The plaintiff does not claim that the offering documents failed to warn investors of the risks of loss associated with the loans; rather, it alleges that the offering documents failed to disclose that the originators had jettisoned altogether the underwriting guidelines that they professed to follow. See, e.g., Tsereteli, 692 F.Sup.2d at 392. The First Circuit in Nomuraheld that generic warnings and disclosures cannot defeat a claim, such as this one, that is based on a “wholesale abandonment of underwriting standards.” Id. at 773. All that is required is that the complaint allege specific practices of abandoning the underwriting guidelines, and link those practices to the originating banks that supplied the mortgages. Id. at 773-74. See also Massachusetts Mut. Life Ins. Co. v. Residential Funding Co., LLC, 2012 WL 479106 at *5 (D.Mass. February 14, 2012) (“MassMutual”).
The plaintiff, moreover, offers substantial support for its claims that the originators deviated from stan *602 dard underwriting guidelines. The practices alleged include, with respect to New Century,[16] aggressively making and loans thus increasing risks to “dangerous and ultimately fatal levels, ” making frequent exceptions in its guidelines for borrowers that otherwise might not qualify for a particular loan, and turning a “blind eye” to the increasing risks and to an “alarming and steady increase in early payment defaults.” ¶109. These practices ultimately led to a “dramatic downgrade” of their securities. ¶118.[17]
The complaints set forth the results of a court appointed bankruptcy examiner’s report explaining how New Century’s “brazen obsession” with loan originations undermined sound underwriting standards. ¶109. The examiner noted that New Century “layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers.” Id. He went on to state that “New Century made, frequent exceptions to its underwriting guidelines for borrowers who might otherwise not qualify for a particular loan.” Id.
The complaints also cite statements from four confidential witnesses, including a former New Century fraud investigator and senior loan underwriter, a former New Century Senior Vice President, and two former New Century underwriters, all of whom stated that New Century had abandoned acceptable underwriting standards and that all loan decisions were volume driven. ¶¶111-114. In addition, the complaints offer news articles, an SEC complaint, and a private action that discuss New Century’s irresponsible lending practices and failure to adhere to underwriting guidelines. ¶¶ 115-119.
Support for the complaints’ contentions with respect to the remaining originators include, inter alia, confidential witness statements, news articles, SEC complaints, investigations by government and private agencies, Massachusetts Attorney General complaints and settlements, private complaints, and FCIC testimony. It is undisputed (indeed, would be judicially noticeable) that residential mortgages in the middle to latter part of the last decade saw an industry-wide surge in defaults, accompanied by a collapse of the housing market and of credit ratings on RMBS generally, and that all of the eight large originators have since filed for bankruptcy leaving investment banks, institutional and individual investors, and the American taxpayer to pick up the pieces. If (as required on a motion to dismiss) the allegations in the complaints are accepted as true, they paint a particularized and compelling portrait of a dramatic loosening of underwriting standards on the part of the originators, while those who securitized and sold the loans were looking the other way.
Still, the defendants argue, the complaint fails to connect its allegations with any of the certificates at issue and fails to identify a single loan that did not meet the underwriting guidelines. Conclusory allegations, they aver, do not satisfy the pleading requirements. They first rely on Footbridge, 3790810 WL at *13, where the court rejected conclusory allegations that the defendant granted abundant exceptions under its underwriting guidelines because the complaint did not connect those allegations to the securitizations at issue. Footbridge, however, involved a claim of fraud for which the federal Private Securities Litigation Reform Act imposes a heightened pleading requirement more stringent than that under Rule 9(b) of the Federal or the Massachusetts Rules of Civil Procedure. Id. at *6-7.
The defendants also rely on New Jersey Carpenters Health Fund, Ltd. v. NovaStar Mortgage, Inc., 2012 WL 1076143 at *5 (S.D.N.Y. March 29, 2012), where the court found general allegations of abandonment of underwriting standards insufficient because they “failed to tie general allegations of abundant exceptions to the specific securitizations in which they invested.” The court noted that the plaintiff did not “provide details that would tie its claim of loosened underwriting guidelines to the specific loans that secured” the certificates the plaintiff bought.
Other courts, however, have not required the sort of direct linkage that the defendants demand here. In Nomura, for example, the First Circuit noted that, although courts disdain “conclusory” or “implausible” allegations, these are “matters of degree rather than sharp-edged categories,” and that the industry practices alleged in the complaint before it were “fairly specific and a number of lenders in the industry are widely understood to have engaged in such practices.” 632 F.3d at 773. The court went on to note that “complaints in other cases have cited to more substantial sources, including statements from confidential witnesses, former employees and internal e-mails.” Id. Even without those more substantial sources, however, the Nomura court held that “[w]hile this case presents ajudgment call, the sharp drop in the credit ratings after the sales and the specific allegations as to [the defendant] offer enough basis to warrant some initial discovery aimed at these precise allegations.” Id. at 773-74.
Similarly, the court in Bear Stearns noted that the complaint had not precisely linked the alleged disregard for underwriting standards -with the decline in value of the certificates at issue. Nonetheless, the court concluded that:
The Complaint is replete with public reports and detailed statements by numerous confidential witnesses that describe the systematic disregard of underwriting standards by the specific parties, involved in the origination of the loans populating the offerings, as well a failure to conduct proper due diligence by the depositors. The facts alleged in the TAC are sufficient to support a reasonable inference that the loan pools were inferior in credit qualify to loans that would have been selected had Defendants’ originators employed the sort of underwriting standards described in the Offering Documents.
Bear Stearns, 2012 WL 1076216 at *16. See also Mass-Mutual, 2012 WL 479106 at *5 (allegations in complaint *603 of widespread abandonment of underwriting guidelines by the specific defendants and poor performance of loans sufficient to state a claim). In Tsereteli, the court similarly concluded that allegations of widespread abandonment “create a sufficient nexus between the alleged underwriting standard abandonment and the loans underlying the Certificates.” 692 F.Sup.2d at 392.
The reasoning of the Nomura, Bear Stearns, MassMutual, and Tsereteli courts is persuasive. A requirement that the complaints link their allegations of disregard for underwriting standards to the underlying loans would be impossible of fulfillment, given that each loan pool is made up of thousands of loans, and it goes beyond what is required at the pleading stage. See Tsereteli, 692 F.Sup.2d at 392. As to whether the plaintiff must link its allegation to the particular securitizations at issue, neither Nomura nor Bear Steams impose such a requirement; a well-founded assertion that the violation was widespread and infected all pools is sufficient. See, e.g., Nomura, 632 F.3d at 773-74. See also FHFA, 2012 WL 1570856 at *19-20; New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC, 720 F. Sup.2d 254, 270 (S.D.N.Y. 2010) (allegations that “behavior permeated the originators such that they systematically ignored their stated underwriting practices” combined with veiy high default of loans underlying the certificates adequately connects the allegations to the offerings in question). Here, the plaintiffs have tied specific practices with specific lending banks and their originators through multiple sources. The soaring default rates raise a reasonable and plausible inference that the loans defaulted because the originators issued them to unqualified borrowers in contravention of accepted underwriting guidelines.
Finally, the defendants cite to Lone Star Fund v. (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383 (5th Cir. 2010), for the proposition that the seller made “no actionable misrepresentations” where it warranted that none of the underlying mortgages were more than thirty days delinquent at the time of transfer, and obligated itself to repurchase the loan or substitute a conforming loan in the event of a delinquency.[18] Id, at 389. The court in Lone Star affirmed a motion to dismiss because the repurchase-or-substitute provision negated any allegation concerning “Barclays’ alleged misrepresentation that there were no delinquent loans in the BR2 and BR3 Trusts when Lone Star purchased the securities” — the sole misrepresentation alleged, id. at 388 — and because under the buyback provision, “one way or another, Barclays committed that the mortgage loan pools would be free of delinquent mortgages.” Id. at 389.
Although the Lone Star decision has its adherents (mostly within the Fifth Circuit), other courts have found it “distinguishable from cases in which plaintiffs claim ‘widespread misrepresentations regarding the nature of the underwriting [and appraisal] practices described in the offering documents.’ ” Massachusetts Mut. Life Ins. Co. v. Residential Funding Company, LLC, 843 F.Sup.2d 191, 201 n.7 (D.Mass. 2012; Ponsor, J.), quoting Employees’Ret. Sys. of the Gov’t of the V.I. v. J.P. Morgan Chase & Co., No. 09 Civ. 3701 (JGK), 2011 WL 1796426, at* 11 (S.D.N.Y. May 10, 2011), and citing P.L.I. Sec. Litig. §18:4.4, 18-65 to 18-66 (2011) (“noting the various ways in which other jurisdictions have distinguished Lone Star, including by limiting it to representations about the absence of delinquent loans and by finding that contractual obligations cannot deprive investors of their rights under the Securities Act”). Accord, Boilermakers Nat’l Annuity Trust v. WaMu Mortg. PassThrough Certificates, Series AR1, 748 F.Sup.2d 1246, 1256 (D.Wash. 2010). Simply put, a commitment to cure presently delinquent loans says little about the risk resulting from a widespread abandonment of underwriting standards, and it does nothing to correct a false representation that those standards were followed.
C. Appraisal Standards and LTV Ratios
The plaintiff also alleges misstatements and omissions of material fact in the offering documents with respect to the standards used for the appraisals of the mortgaged properties. It contends that appraisals were routinely conducted in violation of appraisal standards, resulting in inflated appraisals and understated LTV ratios. The accuracy of an appraisal is critical to the accuracy of an LTV ratio, which is used to evaluate the price and risk of mortgage-backed securities. See, e.g., In re Morgan Stanley Mortgage Pass-Through Certifications Litig., 810 F.Sup.2d 650, 659 (S.D.N.Y. 2011). Because the defendants had access to the underlying appraisal data and a duty to conduct due diligence, the plaintiff asserts that there is a reasonable inference that the defendants knew the appraisals and LTV ratios were false.[19]
The LTV ratio is a measure of credit risk. The higher the ratio, the less equity the homeowner has in the property and the greater the likelihood of default. Mortgages with an LTV ratio of 100% or higher are highly risky for the investor, because the value of the property is insufficient to cover the balance of the loan in the event of a default. See, e.g. FHFA at *12. The LTV ratio is also an indicator of the “investment-worthiness of a security backed by the income from many such loans.” Id,
Each prospectus supplement included statistics regarding the LTV ratios across the underlying loan pool. Again using securitization ABFC 2005-HE1 as an example, the prospectus supplement states that “[approximately 35.28% of the group 1 mortgage loans, approximately 32.37% of the group 2 mortgage loans, approximately 41.33% of the group 3 mortgage loans and approximately 35.47% of all the mortgage loans (in each case by aggregate principal balance as of the cut-off date) had combined loan-to-value ratios at origination in excess of 80.00%. No mortgage loan had a combined loan-to-value ratio exceeding 100.00% as of the cut-off date.” As to the appraisal process, the supplement states:
*604 Each applicant completes an application which includes information with respect to the applicant’s liabilities, income, credit histoiy, employment history and personal information. The Option One Underwriting Guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to such matters as credit histoiy with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments. Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Freddie Mac. The Option One Underwriting Guidelines require a review of the appraisal by a loan underwriter, who may request a written review by an independent appraiser retained by Option One.
The plaintiff argues that this, and other similar statements in other offering documents, misrepresented the appraisal practices and values. The complaint quotes the testimony before the FCIC of Richard Bitner, a former executive of a subprime mortgage originator, to the effect that half of the loans they wrote were overvalued by 10%. ¶¶50-54. Mr. Bitner went on to state that, if multiple properties are overvalued by 10%, and they are then used as comparable sales for future appraisals, the process repeats itself. An underwriter from New Century testified before the FCIC that, in her experience, “fee appraisers hired to go to the properties were oftentimes pressured into coming in ”at value," fearing that if they didn’t, they would lose future business and their livelihood." ¶55. She went on to state that appraisers would “take boards off boarded-up windows, to take the needed photos, then board the properties back up ... or they would omit certain important elements of a property by angling the camera a certain way or zooming close in to make the property look the best possible. This level of appraiser activism compromises their objectivity.” ¶55.
The plaintiff relies also on statements from confidential witnesses. For example, according to an account manager from Fremont (CW 51), his superiors would “call property appraisers and request that they inflate their appraisal values by at least a few thousand dollars, and the appraisers would do so.” ¶201. Similarly, CW 52, a former underwriter at Option One, stated that, with respect to inflated appraisal values, “of course they inflated values.” He went on to note that if an underwriter questioned the appraised value, the account executive and branch manager would override the objection. ¶244. The complaints also refer to the FHFA’s loan review of all sixteen Wall Street defendants, in which the FHFA obtained industry-wide standard automated valuation model (“AVM”) valuations of selected loans.[20] The FHFA review revealed that, contrary to statements in the offering documents, all of the securities contained LTV ratios that were well over 100%.[21]
The defendants first respond that the appraisals were opinions and, as such, not actionable.[22] Moreover, they argue, the offering documents disclosed the subjective nature of the appraised values, and stated that these values might differ from the “actual” value of the property, and that property values will likely fluctuate. As an example, they point to securitization AMSI 2005-R6 at S-12, which states that “[ajdditionally, the Originator’s determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the Mortgage Loans may differ from the appraised value of such mortgaged property or the actual value of such mortgaged property.” Finally, the defendants contend that the plaintiff has failed adequately to allege that any appraisal in this case was not an honestly held opinion at the time it was made, or that it was inaccurate.
The defendants’ arguments fall short of the mark. The plaintiff does not allege only that the appraisal amounts were inflated, it alleges that the originators did not conduct the appraisals in accordance with the industiy standards identified in the offering documents. As the court noted in Bear Stearns, “the conclusion that a house is worth $500,000 may be a statement of subjective opinion, but the assurance that the $500,000 figure was reached in accordance with a body of professional appraisal standards is a statement of verifiable fact.” 2012 WL 1076216 at *17.
Such “verifiable fact” is adequately pled in the complaints in this case, and is supported by confidential witness statements, allegations incorporated into a 2007 New York Attorney General suit, FCIC testimony, and an insurance company lawsuit that sufficiently allege deviant conduct by New Century, WaMu/Long Beach, Fremont, WMC, Ameriquest, Option One, Accredited, and First Franklin to support an inference that the securitizations at issue were affected. See Plumbers & Pipefitters’ Local 562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp., 2012 WL 601448 at *13, and contrast Nomura 632 F.3d at 774 (where the plaintiff failed to allege that any specific originator asserted pressure on appraisers to inflate the appraisal values).
To the extent that the complaint claims that the appraisals were inflated, the plaintiff has pled sufficient facts to support in inference that these opinions not only were objectively false, but also subjectively false. The loan sampling results reported by the FHFA *605 as to each Wall Street defendant are suggestive of widespread inaccuracies in appraisal values. See FHFA, 2012 WL 1570856 at *16. The complaints also contain sufficient allegations, primarily in the form of confidential witnesses, that the appraisers themselves knew, at the time they made an appraisal, that its value was inflated. See id. See ¶55.
The defendants’ argument that the complaints fail to allege that the defendants themselves knew of the inflated appraisals, Defs. Mem. at 29 n.21, is unavailing, because there is no such requirement. As the First Circuit noted in Nomura,
An opinion may still be misleading if it does not represent the actual belief of the person expressing the opinion, lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement. Liability may on this theory also extend to one who accurately described the opinion.
632 F.3d at 775 (citations omitted); accord, FHFA, 2012 WL 1570856 at *15; Bear Stearns, 2012 WL 1076216 at *18.
Finally, the reasoning of the First Circuit in Nomura with respect to disclosures of underwriting guidelines applies to appraisal standards as well. If it is true that the mortgages underlying the RBMS were infected by widespread and systematic abandonment of represented appraisal procedures and inaccurate LTV ratios, any warnings to the effect that property values will fluctuate is insufficient. See MassMutual, 2012 WL 479106 at *6. Nor is it necessary at this stage that the plaintiff identify any specific appraisals in the securitizations at issue that were inaccurate. It is enough that the plaintiff link the practices with the lending banks. Nomura, 632 F.3d at 773. The plaintiffs allegations that the defendants misrepresented both the standard used to generate appraisals and the accuracy of the appraisals and LTV ratios thus survive the motion to dismiss.
D. Owner-Occupancy Rates
The plaintiff alleges that the offering materials overstated the number of properties that were owner-occupied in the underlying loan group for each securitization. It contends that this resulted from the mortgage originators’ knowing acceptance of false information from loan applicants. Owner-occupancy rates are material to investors, because a borrower whose primary residence is the mortgaged property is thought to be less likely to default than the borrower who uses the property as a second home or as an investment. See FHFA, 2012 1570856 at *16.
The prospectus supplements provide a breakdown of the occupancy status of the mortgagors. Staying with securitization ABFC 2005-HE1 as an example, the supplement states that 8,517 of the properties were occupied by the owners as their primary residence; 790 were non-owner-occupied; and 156 were second homes. A footnote to the chart states that the occupancy status is “(biased on a representation made by the borrower at the time of origination.”
The defendants take the position that because the offering documents explicitly stated that the owner-occupancy rates were based solely on the borrowers’ representations at origination, the offerors cannot be liable if the representations were false.[23] They rely on MassMutual for the proposition that they cannot be liable for alleged misstatements where they simply repeated information provided them by the borrowers. A similar argument met with success in the MassMutual case, supra, in which the court reasoned as follows;
These disclosures made by Defendants in the cases now before this court were fundamentally different from those the First Circuit found insufficient to shield the defendants from liability in Nomura. Unlike the disclosures in Nomura, the disclosures regarding owner-occupancy rates in these cases did more than simply warn investors that guidelines might not always be followed or that some of the rates might fluctuate. The disclosures specifically stated that all owner-occupancy rates were based only on borrowers’ representations. The disclosures thus put investors on notice that none of the owner-occupancy information had been verified by Defendants and that the rates represented only the self-reported data provided by borrowers, which might be inaccurate.
Because the offering documents explicitly stated that all occupancy rates were based only on borrowers’ representations and because Plaintiff does not allege that Defendants falsely reported the borrowers’ representations, the documents relied on by Plaintiff contained no misstatements or omissions concerning owner-occupancy rates as a matter of law.
2012 WL 479106 at *8.
Three months later, however, the FHFA court rejected a similar argument, noting that
[s]ection 12(a)(2) [the federal analogue to MUSA’s section 410(a)(2)] . . . imposes liability on “any person . . . who offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact.” [This provision and section 11 of the Securities Act] are designed “to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.” If defendants were correct that a party could transform the Securities Act’s strict liability regime into one that required scienter simply by attributing factual information in the offering materials to a non-defendant third parly, this purpose would be significantly undermined.
2012 WL 1570856 at *17 (emphasis in opinion), quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 381B82 (1983).
*606 It is hard to imagine a securities offering whose disclosures did not depend, to a material extent, on information obtained from third parties. I believe that the FHFA approach is the more consistent with the language and purposes of MUSA’s section 410(a)(2) and section 12(2) of the Securities Act — both of which make sellers and solicitors strictly liable for their statements of material fact unless they are able to prove “that [they] did not know, and in exercise of reasonable care could not have known” that the statements were false — and I follow it. The complaints adequately allege misrepresentation of owner-occupancy rates.
E.Debt-to-income Ratios
The plaintiff alleges that the originators allowed applicants for “stated income” loans to provide false income information and failed to verify the applicants’ purported income. The defendants first argue that the offering documents disclosed that loans would be granted on a stated income basis with no verification. They also recycle their assertion that they cannot be held liable for representations by the third-party borrowers.
For essentially the reasons discussed above with respect to the plaintiffs other contentions, the defendants’ argument falls short. There are multiple allegations in the complaint from all the sources described, supra, to the effect that the originators accepted borrowers’ stated incomes even though, on their face, the incomes were unrealistic and thus highly suspect. As but one example, confidential witnesses stated Fremont approved loans for a pizza delivery man who claimed an income of $5000 to $6000 a month, for landscapers and housekeepers who reported $10,000 in monthly income, and window washers who claimed a yearly income of $75,000. According to the complaint, an internal J.P. Morgan memorandum instructed brokers how to manipulate stated income by classifying all income, including a gift, as base income. ¶552. That the offering documents included disclosures that income information was based on third-party representations is of no moment at the motion to dismiss stage. See discussion, supra. The plaintiffs claims with respect to debt-to-income ratios thus survive the motion to dismiss.
F.Assignment and Transfer of Mortgages
Generally, state laws and the applicable pooling and servicing agreements (“PSAs”) require, as part of the securitization process, a promissory note and a security instrument (either a mortgage or deed of trust). CPIM alleges that the offering documents misrepresented that the. issuing trust had obtained good title to the mortgage loans that made up the loan pool. They argue that the notes and/or the security instruments were routinely held by the originators and not transferred to the trusts.
As with the allegations already discussed, the complaints (especially ¶¶68-89) offer particularized support for their contentions that shoddy practices regarding assignment and transfer of mortgages and the notes they secure was endemic in the industry, and that at a number of the defendants in this case — Asset Backed Funding Corporation, Banc of America Securities, Countrywide, and Option One — partook, along with others. There is less concrete corroboration here, perhaps, than for the allegations concerning underwriting guidelines, appraisal standards and LTV ratios, owner-occupancy rates, and debt-to-income ratios, but there is enough to survive a Rule 12(b)(6) motion.
G.Due Diligence
The plaintiffs allege that the defendants failed to conduct due diligence of the underlying loans as represented in meetings, oral statements, term sheets, loan tapes, and pitch books. The defendants counter that the complaint fails to identify any inconsistency between their alleged statements regarding due diligence and the alleged reality of the due diligence process. In fact, the complaints allege numerous examples of failures by the Wall Street defendants to conduct due diligence as advertised.
For example, a confidential witness who, as a Clayton due diligence underwriter,[24] conducted due diligence for Morgan Stanley stated that Morgan Stanley made exceptions to loans with high debt-to-income ratios, and bought loans even though the borrowers’ DTI ratios were based on the initial teaser rate, rather than the fully indexed rate. ¶294. According to this witness, Morgan Stanley did not consider the borrower’s ability to pay the fully indexed rate after the teaser rate expired. Even though a Clayton underwriter would comment that a particular loan should not be bought, Morgan Stanley would, nonetheless, purchase the loan. Id.
Another confidential witness, who had worked at both Clayton and Morgan Stanley, confirmed that Morgan Stanley was well aware of the poor quality of the loans it purchased and securitized. ¶295. According to this witness, Morgan Stanley would routinely buy loans with a DTI ratio over 60%, despite a policy not to buy loans with DTI ratios higher than 55%. In addition, a vice president of Morgan Stanley’s Boca Raton due diligence department, stated in an interview with the FCIC, that many of the major functions of the due diligence process, including which loans were to be sampled for compliance with underwriting guidelines, were dictated by Morgan Stanley. Id.
Discovery in another action revealed that Bear Stearns implemented policies to “securitize riskier and riskier loans without performing anything close to adequate due diligence.” ¶333. Bear Steams’ Senior Managing Director and Co-Head of Mortgage Finance issued a directive to reduce the amount of due diligence “in order to make us more competitive on bids with larger sub-prime sellers.” ¶334. Bear Steams thus reduced the size of loan samples it subjected to due diligence and performed due diligence only after the loans were purchased. Id.
The complaints also allege that the defendants consistently asked third-party due diligence firms to reduce due diligence, and, frequently ignored any negative results. For example, the complaints state that Morgan *607 Stanley bought and securitized about 56% of the sampled loans that Clayton had determined failed to meet underwriting guidelines. ¶300. Paragraph 549 of the complaints states that J.P. Morgan “waived in” 51% percent of the loans that Clayton had rejected. The complaints make similar assertions as to other defendants. See, e.g., ¶¶429, 477, 503, 612.
Overall, the allegations in the complaints plausibly allege that the named financial institutions rushed to procure loans that they knew to be risky, in derogation of their representations that they would conduct due diligence. The plaintiff has adequately alleged that the defendants ignored their own stated practices as they sought increasing volumes of mortgage loans and acceded to the originators’ demands for limited quality control. This is sufficient to withstand the motion to dismiss with respect to the defendants’ due diligence.
H. Credit Enhancement
The complaints allege that the defendants made misstatements and omissions regarding the sufficiency of credit enhancement supporting the offerings, more specifically with respect to “overcollateralization, which means that the total principal balance of the mortgage loans in the pool for a securitization (and therefore presumably the total value of the underlying properties) exceeds the aggregate amount of securities issued and sold in the securitization.” The representations on this subject in the offering documents were false, because the improper inflation of appraisals “caused the listed LTV ratios and levels of credit enhancement to be untrue.” (¶¶92-93)
The defendants argue that the claims in the complaints are purely conclusory and thus must be dismissed. It cites to Plumbers & Pipefitters’ Local #562, 2012 WL 601448 at *14, where the court concluded that the complaint had “fail[ed] to allege that any credit enhancement description was incorrect.” Here, however, the plaintiff is claiming that the credit enhancement was misrepresented because the inflated appraisals resulted in high LTV ratios. As a result, the mortgages exceeded the value of the underlying properties and were thus not enough to cover the notes in case of defaults on the loans. This contention rests largely on the plaintiffs claims that the defendants misrepresented the appraisals, for which there are sufficient factual allegations in the complaint. See discussion, supra. The defendants’ argument that the plaintiffs allegations are derivative of its appraisal claims and must fail for the same reasons is thus unavailing.
The Motion to Dismiss is therefore denied as to Count I, alleging “direct seller” liability under section 410(a)(2) on the part of the Wall Street Banks.
6. Count II Against the Depositor Defendants
Count II, however, asserting 410(a)(2) claims against the Depositor Defendants, stands on a fundamentally different footing. Under G.L.c. 110A, §410(a) (2), any person who
offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue either at law or in equity .. . (Emphasis supplied).
The U.S. Supreme Court, considering the identical provision of the federal Securities Act (15 U.S.C. §771(a)(2)), has noted that by its express terms, the statute “imposes liability on only the buyer’s immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller’s seller.” Pinter v. Dahl, 486 U.S. 622, 644 n.21 (1988).[25]
The requirement that the plaintiff be “the person buying the security from” the defendant does not require, in all cases, privity of contract. Under either the state or the federal Act, “[a]n offeror or seller . . . is someone who ‘successfully solicits the purchase [of securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner.’ . . . This definition includes those who actually transfer title of the securities as well as brokers and other agents of the direct seller.” Mass. Mutual, 2012 479106 at *8, quoting Pinter, 486 U.S. at 64); accord, Cohen v. State Street Bank and Trust Co., 72 Mass.App.Ct. 627, 635 (2008).
It does not, however, extend to an issuer or other remote seller who sells the security at a discount to an underwriter, who then sells it to an investor, unless the issuer/remote seller “actively ‘solicited’ the plaintiffl’s] purchase of securities to further [its] own financial motives, in the manner of a broker or vendor’s agent.” Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1215 (1st Cir. 1996). “Absent such solicitation, [the issuer] can be viewed as no more than a ’’seller’s seller," whom plaintiffs would have no right to sue . . ."Id. at 1215. “Under Pinter. . . neither involvement in preparation of a registration statement or prospectus nor participation in ‘activities’ relating to the sale of securities, standing alone, demonstrates the kind of relationship between defendant and plaintiff that could establish statutory seller status.” Id. at 1216 (emphasis in original); accord, Sonus Networks, 2006 WL 1308165 at *10.
So far as appears, every court confronting the question of whether “depositor defendants” — the bundler/issuers of RMBS certificates — are liable as “sellers” or “solicitors” under MUSA or the federal Securities Act has answered in the negative. Mass. Mutual, 2012 479106 at *8-10 (MUSA); Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp., No. 11-cv-10414, slip op. at 9-10 (C.D.Cal. April 16, 2012) (MUSA); Maine State Ret Sys. v. Countrywide Fin. Corp., 2011 WL 4389689 (C.D.Cal. 2010) *608 (Securities Act); In re Thornburg Mortgage, Inc. Securities Litigation, 695 F.Sup.2d 1165, 1220-21 (D.N.M. 2010) (Securities Act). In response, CPIM points to allegations in the complaints that all of the defendants “solicited” it in Massachusetts (¶14), and that
[w]orking with the Wall Street Banks, the Depositor Defendants . . . prepared and circulated the registration statements, accompanying prospectuses, or private placement memoranda, through which the Depositor Defendants and the Wall Street Bank Defendants offered and sold the Securities and filed the registration statements and prospectus supplements with the SEC. (¶31)
No additional specifics are provided concerning the Depositor Defendants’ alleged solicitation, which would seem on its face to be contrary to the prevailing business model for a firm commitment underwriting. See Mass. Mutual v. Residential Funding, 2012 WL 479106 at *9. This is the sort of pleading that might have survived the old Nader v. Citron[26] pleading standard, but comes up short under the Iannacchino standard because it does not “plausibly suggest! ] ... an entitlement to relief.”
It may seem peculiar, even unjust, to impose liability on a republisher of falsehoods (the underwriter) but discharge their originator (the issuer). As the Supreme Court noted in Pinter, however,
There is no support in the statutory language or legislative history for expansion of §12(1) primary liability beyond persons who pass title and persons who “offer,” including those who “solicit” offers . . . The broad remedial goals of the Securities Act are insufficient justification for interpreting a specific provision “more broadly than its language and the statutory scheme reasonably permit.” We must assume that Congress meant what it said.
486 U.S. at 650, 653. The Massachusetts Legislature having declared its intention that MUSA be interpreted harmoniously with the Securities Act, G.L.c. 110A, §415; Marram at 50, the same observations apply here. Count II, against the Depositor Defendants, is therefore dismissed.
7. Count III: Secondary Liability of the “Lead Underwriter” Wall Street Banks
In Count III, the plaintiff asserts that the Lead Underwriter of each security that CPIM purchased, whether in the initial offering or on the secondary market, is liable under G.L.c. 110A, §410(b).[27] AppendixAto each complaint discloses that in many cases, the lead underwriter was also the direct seller, but in other cases, the seller was a different Wall Street Bank. In some cases, the purchase was years after the offering; i.e., was presumably on the secondary market.
The defendants’ first response — that the complaints fail to allege a primary violation of §410(a)(2) (without which no secondary liability can attach) is discussed at length and rejected, above. They next argue that the complaints contain only conclusory allegations that the Lead Underwriters materially aided the sales at issue and,- in any event, are particularly inadequate where they pertain to purchases in the secondary market.
With respect to securities purchased in the initial offering, the allegations that the lead underwriter— each a broker-dealer, even if not the direct seller— "materially aided in the sale of the Securities to the Plaintiff by preparing the misleading Offering Documents and other offering materials that were provided to Plaintiff and by circulating the misleading Offering Documents and other offering materials to the market" (¶729) is plausible on its face. Count III thus states a claim as to purchases made in an initial offering.
Secondary-market purchases present quite different considerations. Courts considering an underwriter’s secondary liability under cognate provisions in other states’ Blue Sky laws have reached differing, but analytically consistent, results. The plaintiff cites to Foster v. Jesup & Lamont Sec. Co., 483 So.2d 1201, 1207 (Ala. 1986), in which the Alabama Supreme Court, construing a provision in that state’s Blue Sky law identical to our own section 410(b), found that a broker-dealer whose “name was displayed prominently on an offering document used in connection with the sale... as the issue’s primary best efforts underwriter” was liable to the plaintiff, who purchased in the initial private offering and who “relied on the firm’s participation in the offering in reaching his decision to purchase an interest,” even though the firm — apparently unbeknownst to the plaintiff buyer — "had withdrawn from the offering."
The defendants prefer the holding of In re National Century Financial Enterprises, Inc., 2012 WL 685495 at *66-69 (S.D. Ohio March 2, 2012), in which the court dismissed several plaintiffs’ Blue Sky claims against the original underwriter (Credit Suisse), observing that “the statutes’ imposition of secondary liability is limited to those who participate in or materially aid the sale and does not encompass all who assist in the overall fraud” by preparing the original offering documents. The exception was MetLife, which had “evidence that Credit Suisse supplied it with the PPM MetLife used in purchasing notes in the secondary market,” its claim survived. Id. at 66.
The difference is that Foster involved an initial offering in which the defendant’s participation was the reason the plaintiff made the purchase; National Century involved secondary market sales in which Credit Suisse only interacted with the plaintiff in a single transaction; its exposure was therefore limited to that single sale.[28] Under MUSA, the defendant must have “materially aid[ed] in the sale” to the plaintiff, not to an earlier link in the chain of title. In this, MUSA (being a Uniform Act) is typical of Blue Sky laws nationwide. See Johnson, “Secondary Liability for Securities Fraud: Gatekeepers in State Court,” 36 Del.J.Corp.Law 463, 478 (2011) (“Express causes of action for securities fraud contained *609 in the majority of blue sky laws are privily based, and unlike [federal] Rule 10b-5, they do not provide civil liability for secondary market transactions”).
From the complaints (especially Appendix A to each), it is clear that some — likely a minority — of the RMBS in question were purchased in the secondary market. It is not always clear which; nor are there particularized allegations, meeting the Iannacchino standard, concerning what any particular defendant — lead underwriter or not — did to “materially aid[ ] in the sale” on the secondary market to the plaintiff or its assignor. Count III is therefore dismissed as to all securities purchased on the secondary market from a seller other than a defendant.
ORDER
For the foregoing reasons, the Motion to Dismiss is DENIED as to Count I; ALLOWED as to Count II; and ALLOWED as to so much of Count III pertains to purchases made in the secondary market but otherwise DENIED.

 The plaintiff filed two separate actions, SUCV 2010-2741-BLS1 and SUCV 11-0555-BLS1. The parties agree that the two complaints are identical in all material respects, except that they refer to different RMBS. Each asserts claims for a violation of G.L.c. 110A, §410(a)(2) against the Wall Street defendants as direct sellers (Count I); a violation of G.L.c. 110A, §410(a)(2) against the depositor defendants (Count II); and a violation of G.L.c. 110A, §410(b) against the Wall Street defendants as lead underwriters (Count III).

 For example, the mortgage pool in securitization ABFC 2005-HE1, one of the RMBS at issue here, contains 9,436 mortgage loans.

 Each tranche, or class of certificates, is a distinct security with a distinct identifier, a distinct priority of payment, a distinct degree of risk, a distinct credit rating, and a distinct yield to investors. Typically, investors in the junior or lower-rated tranches have lower payments and higher degrees of risk. If, for example, the borrowers default on their loans, it is the junior investors who are the first to bear the losses. Accordingly, the junior investors earn higher rates of return. Investors in the senior or higher-rated tranches enjoy higher priorities of payment and face comparatively less risk; they therefore earn comparatively lower rates of return. While the number of certificates in each offering varies, for example securitization ABFC 2005-HE1 lists 17 certificates: seven senior certificates and ten subordinate certificates.

 “Kickout” refers to the mortgage originator’s contractual obligation to repurchase or replace loans that suffer from deficient documentation, an uncured material beach of a representation or warranty, a payment default within a specified time period, or other specified deficiencies.

 The eight are: New Century Mortgage Corporation, Long Beach Mortgage Company, Washington Mutual, Fremont Investment & Loan, WMC Mortgage Corporation, Argent Mortgage Company, Ameriquest Mortgage, Option One Mortgage Corporation. The Amended Complaint in Civ. Action No. 11-0555-BLS1 states that the eight originators and Countrywide account for 79.5% of the underlying loans. The difference is not material to this motion.

 “Credit enhancement," the complaint alleges, consists of such inducements as “overcollateralization” (total principal value of mortgage loans exceeding the aggregate amount of the securities they comprise) and “excess interest” (aggregate interest due on underlying mortgage loans exceeding that distributable to security holders plus management fees).

 The Complaints also have, at ¶¶98-701, numerous particularized examples of misrepresentations in the offering documents concerning these and other matters (generously larded with cautionary tales from a wide variety of sources concerning the subprime lending crisis and its fallout).

 As both the statute and the Marram decision elsewhere make clear, once the buyer has proved a false statement or omission of a material fact, it is the seller who must shoulder the “heavy burden” of proving that it neither knew nor should have known the truth of the matter. Marram at 52, citing G.L.c. 110A, §410 (a)(2) and J.C. Long, Blue Sky Law, §9:23 at 9-35 (2003) (defendant held to an “inverse negligence standard” that is “a very difficult defense to sustain”).

 G.L.c. 110A, §414(c) reads as follows: “For the purpose of this section, an offer to sell or to buy is made in the commonwealth, whether or not either party is then present in the commonwealth, when the offer (1) originates from the commonwealth or (2) is directed by the offeror to the commonwealth and received at the place to which it is directed, or at any post office in the commonwealth in the case of a mailed offer.”

 The court in Bulldog 11 noted that “determining whether a communication is an offer may involve difficult and close questions of fact, and depends upon all the facts, and the surrounding circumstances including the nature, source, distribution, timing, and apparent purpose and effect of the published material.” 460 Mass. at 653 (internal quotations and citations omitted).

 The states to which the defendants point are California (two-year statute of limitation), Connecticut (two-year statute of repose), Delaware (three-year statute of limitation), Maiyland (one-year statute of limitations, three-year statute of repose), Minnesota (two-year statute of limitation), Missouri *610 (two-year statute of limitations, five-year statute of repose), North Carolina (three-year statute of limitation, five-year statute of repose), Texas (three-year statute of limitation), Virginia (two-year statute of repose), and Washington (three-year statute of limitation). The defendants do not appear to contend at this stage that the actions were untimely under MUSA’s four-year statute of limitations, G.L.c. 110A, §410(e).

 See, e.g., Dillon Securities, Inc. v. Bartolini, 944 F.2d 911 (10th Cir. 1991); United Heritage Life Ins. Co. v. First Matrix Investor Services, No. CV 06-0496, 2009 WL 3229374, at *4 (D.Idaho Sept. 30, 2009): Nuveen Premium Income Municipal Fund 4, Inc. v. Morgan Keegan & Co., 200 F.Sup.2d 1313 (W.D.Okla. 2002); Chrysler Capital Corp. v. Century Power Corp., No. 91 Civ. 1937, 1992 WL 163006, at *2 (S.D.N.Y. June 24, 1992); Barneby v. E.F. Hutton & Co., 715 F.Sup. 1512, 1533-36 (M.D.Fla. 1989); Simms Investment Co. v. E.F. Hutton & Co., 699 F.Sup. 543, 545 (M.D.N.C. 1988); Citizens Ins. Co. of America v. Daccach, 217 S.W.3d 430, 441 (Tex.App. 2007), and authorities cited; Johnson-Bowles v. Division of Securities, 829 P.2d 101, 110 (Utah App. 1992); J. McClard, ‘The Applicability of Local Securities Acts to Multi-State Securities Transactions,” 20 U.Rich.L.Rev. 139 (Fall 1985).

 These include New Century Mortgage Corp. (“New Century”); Long Beach Mortgage Company (“Long Beach”); Washington Mutual (“WaMu"); Fremont Investment & Loan (“Fremont”); WMC Mortgage Corporation (“WMC”); Argent Mortgage Company (“Argent”); Ameriquest Mortgage (“Ameriquest”); and Option One Mortgage Corporation (“Option One”). Along with defendant Countrywide Securities Corporation (“Countrywide") , which originated most of its own mortgage loans through its affiliates, these eight originators account for more than 70% of the loans underlying the securities.

 The acquisition date for that offering was November 10, 2006; the total amount paid for it was $2,672,350.00.

 These allegations are summarized here as a sample. There are similarly detailed allegations with respect to a half-dozen of the other maj or originators — Long Beach, Washington Mutual, Fremont, WMC, Ameriquest, and Option One — and more anecdotal allegations regarding Accredited, Countrywide, American Home Mortgage.

 The complaints set forth similar assertions with respect to the other originators, that need not be repeated.

 As an example, the buyback provision for securitization ABFC 2005-HE1, where Option One was the originator and Banc of America the seller or underwriter, states as follows:
Within 60 days following the Closing Date, the Custodians will review the Mortgage Loans and the Related Documents pursuant to the Pooling and Servicing Agreement and if any Mortgage Loan or Related Document is found not to conform to the review criteria set forth in the Pooling and Servicing Agreement and such defect has a material and adverse effect on the Certificateholders and is not cured within 120 days following notification thereof to the Seller (or within 90 days of the earlier of the Seller’s discovery or receipt of notification if such defect would cause the Mortgage Loan not to be a “qualified mortgage” for REMIC purposes), the Seller will be obligated to either (i) substitute for such Mortgage Loan an Eligible Substitute Mortgage Loan;... or (ii) purchase such Mortgage Loan at a price (the “Purchase Price”) equal to the outstanding Principal Balance of such Mortgage Loan as of the date of purchase, plus all accrued and unpaid interest thereon, computed at the Mortgage Interest Rate through the end of the calendar month in which the purchase is effected, plus the amount of any unpaid Servicing Fees (without duplication) and unreimbursed Advances and Servicing Advances made by the Servicers . .. The obligation of the Seller to repurchase or substitute for a Defective Mortgage Loan is the sole remedy regarding any defects in the Mortgage Loans and Related Documents available to the Trustee or the Certificateholders.

 As with its other arguments, the plaintiff incorporates and relies upon government investigations, complaints in other litigation, and witness statements asserting that originators routinely pressured appraisals to provide artificially inflated appraisals into inflating appraisals misstatements and omissions of material fact with respect to the standards used for appraisals of the mortgaged properties and their resulting LTV ratios.

 To the extent that the defendants take issue with the plaintiffs reliance on data arrived at using the AVM, any argument as to the methodological flaws in the AVM are premature at this stage. The pros and cons of the AVM are best argued after the parties have had the benefit of discoveiy.

 The percentage of underwater loans in each security sample differs, of course, as to each Wall Street defendant. With respect to Morgan Stanley, for example, the percentage of loans with LTV ratios over 100% ranged from 3% to 12.7%. ¶217. For Bear Stearns, 11.53% of the sampled loans had LTV ratios over 100%. ¶353.

 The defendants’ challenge to the plaintiffs reliance on complaints in other actions and governmental investigations regarding the originators of the loans underlying the certificates at issue here is unavailing. See discussion, supra.

 The defendants also argue that the plaintiff does not adequately allege facts indicating that the owner-occupancy rates were misstated and has not made any allegations specific to the securitizations at issue. Given the court’s conclusion, it need not address these two arguments.

 Clayton is a service provider to the financial services industry.

 In Pinter the Supreme Court disapproved, as contrary to the language of the Securities Act.

 372 Mass. 96 (1977).

 Section 410(b) provides:
Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

 The other case cited by the plaintiffs, Kennedy v. Josephthal & Co., 1983 WL 1314 (D.Mass. 1983; Mazzone, J.), is likewise inapposite to a case of secondary market purchases. There, the defendant in a case of alleged fraud in the offering and sale to the plaintiffs of limited partnership interests sought indemnity and contribution from eight parties whom it claimed had participated in various ways in the offering. Judge Mazzone observed, “The full and proper scope of ‘non-sellers’ intended by the legislature to be included within this section has yet to be articulated by the state courts of Massachusetts; however, it is apparent from the statutory language that the general purpose of section 410(b) is to subject all those who ‘materially aid’ in the sale of a security, whether ‘directly or indirectly,’ to liability for securities fraud.” Id. at *6. Massachusetts law remains as undeveloped on the issue of secondary market liability as it was before, and just after, the Kennedy case.